1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN JOSE DIVISION)

4

5    In re:

6    THE BILLING RESOURCE dba          Case No. 07-52890-ASW
     INTEGRETAL, a California
7    corporation,                      Chapter 11

8                                       San Jose, California
                                        October 15, 2007
9                                       2:11 p.m.

              Debtor.
10   _____/

11

12                    TRANSCRIPT OF PROCEEDINGS
            a) FINAL MEETING RE EMERGENCY MOTION FOR USE OF
13            CASH COLLATERAL AND GRANTING REPLACEMENT
                        LIENS BY DEBTOR
14    b) SUPPLEMENTAL OPPOSITION BY FEDERAL TRADE COMMISSION
        c) SECOND SUPPLEMENTAL OPPOSITION BY DAVID R. CHASE,
15    FEDERAL RECEIVER OF ACCESS ONE COMMUNICATIONS, INC.
                  AND NETWORK ONE SERVICES, INC.
16          d) OPPOSITION TO SUPPLEMENTAL MEMORANDUM
                    BY THERMO CREDIT, LLC
17            e) SECOND SUPPLEMENTAL OBJECTION BY
                  PUBLIC COMMUNICATIONS SERVICES
18            f) OBJECTION BY UNITED STATES TRUSTEE
                g) RENEWED OPPOSITION BY POL, INC.
19            h) OBJECTION BY PERSONAL VOICE, INC.
        i) REPLY IN SUPPORT OF MOTION BY PAYMENTONE CORP.

20

21          BEFORE THE HONORABLE ARTHUR WEISSBRODT
                UNITED STATES BANKRUPTCY JUDGE

22

23

24

25

```
1   APPEARANCES:

2
    For the Debtor:          SHEPPARD, MULLIN, RICHTER and
3                            HAMPTON
                             BY: MICHAEL H. AHRENS, ESQ.
4                                        -and-

5                                STEVEN SACKS, ESQ.
                             Four Embarcadero Center, 17th Floor
6                            San Francisco, California 94111

7
8   For the Federal          DANNING, GILL, DIAMOND &
    Receiver:                KOLLITZ, LLP
9                            BY: WALTER K. OETZELL, ESQ.
                             2029 Century Park East, 3rd Floor
10                           Los Angeles, California 90067

11
12  For the U.S. Trustee:    OFFICE OF THE U.S. TRUSTEE
                             BY: JOHN S. WESOLOWSKI, ESQ.
13                           280 South First Street, #268
                             San Jose, California 95113
14
15
    For PaymentOne:          O'MELVENY & MYERS, LLP
16                           BY: STEPHEN H. WARREN, ESQ.
                                         -and-
17                               VICTORIA A. NEWMARK, ESQ.
                             400 South Hope Street
18                           Los Angeles, California 90071

19
20  For Thermo Credit:       CLARK & TREVITHICK
                             BY: DELORES CORDELL, ESQ.
21
                                         -and-
22
                             TAFT, STETTINIUS & HOLLISTER
23                           BY: W. TIMOTHY MILLER, ESQ.

24                           (APPEARING TELEPHONICALLY)

25
```

```
1   APPEARANCES (CONTINUED):

2

3   For POL, Inc.            DIEMER, WHITMAN and CARDOSI
                             BY: KATHRYN S. DIEMER, ESQ.
4                            75 East Santa Clara Street
                             San Jose, California 95113
5

6
    For the Committee:       PACHULSKI, STANG, ZIEHL, JONES
7                            BY: JOHN FIERO, ESQ.
                             150 California Street, 15th Floor
8                            San Francisco, California 94111

9

10  For Personal Voice:      THOMAS LITTLE, ESQ.

11

12  For BSG Clearing         KING & SPALDING
    Solutions:               BY: FELTON E. PARRISH, ESQ.
13                                    -and-
                                  JAMES PARDO, JR., ESQ.
14
                             (APPEARING TELEPHONICALLY)
15

16
    For United On Line:      BUCHALTER NEMER, et al.
17                           BY: JEFF GARFINKLE, ESQ.

18                           (APPEARING TELEPHONICALLY)

19
    For PCS:                 LINER, YANKELEVITZ, SUNSHINE
20                           BY: LESLIE A. COHEN, ESQ.
                             1100 Glendon Ave., 14th Floor
21                           Los Angeles, California 90024

22                           (APPEARING TELEPHONICALLY)

23
    For the Federal          TEW CARDENAS, LLP
24  Receiver:                BY: JEFFREY SCHNEIDER, ESQ.

25                           (APPEARING TELEPHONICALLY)
```

```
 1   APPEARANCES (CONTINUED):

 2
     For the Federal Trade      MICHAEL P. MORA, ESQ.
 3   Commission:                         -and-
                                COLLET GUERARD, ESQ.
 4
                                (APPEARING TELEPHONICALLY)
 5

 6   For Network                DANIEL H. COLEMAN, ESQ.
     Telephone Services:        21135 Erwin Street
 7                              Woodland Hills, California 91367

 8

 9   Court Recorder:            ERIN COYLE
                                UNITED STATES BANKRUPTCY COURT
10                              280 South First Street
                                San Jose, California 95113
11

12
     Transcription Service:     Jo McCall
13                              Electronic Court
                                Recording/Transcribing
14                              2868 E. Clifton Court
                                Gilbert, Arizona 85297
15                              Telephone: (480-361-3790)

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2    October 15, 2007                          2:11 p.m.

3                        ---oOo—

4          THE CLERK: Please rise.

5          THE COURT: Thank you ladies and gentlemen.

6    Please be seated.

7          THE COURT: This is the case of <u>Billing Resource</u>.

8    I'll take appearances of counsel in the courtroom.

9          MR. AHRENS: Good afternoon, Your Honor, Michael

10   Ahrens and Steven Sacks of Sheppard, Mullin, Richter and

11   Hampton for the Debtor.

12         THE COURT: Good afternoon.

13         MR. OETZELL: Good afternoon, Your Honor, Walter

14   Oetzell of Danning, Gill, Diamond & Kollitz on behalf of

15   the Federal Receiver.

16         THE COURT: Good afternoon.

17         MR. WESOLOWSKI: Good afternoon, Your Honor, John

18   Wesolowski for the U.S. Trustee

19         THE COURT: Good afternoon.

20         MR. WARREN: Good afternoon, Your Honor, Stephen

21   Warren of O'Melveny & Myers on behalf of PaymentOne.  I'm

22   also here in the courtroom with Victoria Newmark of our

23   office.

24         THE COURT: Very good.  Welcome to both of you.

25         MS. CORDELL: Good afternoon, Your Honor, Delores

1  Cordell of Clark & Trevithick on behalf of Thermo Credit.

2          THE COURT: Good afternoon.

3          MS. DIEMER: Good afternoon, Your Honor, Kathryn

4  Diemer on behalf of secured creditor, POL.

5          THE COURT: Good afternoon.

6          MR. FIERO: Good afternoon, Your Honor, John Fiero

7  of the Pachulski, Stang law firm for the Committee.

8          THE COURT: Good afternoon.

9          MR. LITTLE: Good afternoon, Your Honor, Thomas

10  Little representing Personal Voice, Inc.

11          THE COURT: Thank you.

12          THE COURT: Say your last name again?

13          MR. LITTLE: Little.

14          THE COURT: Thank you.

15          MR. LITTLE: Thank you.

16          THE COURT: Wait a second.  We have appearances on

17  the phone.  Mr. Parrish, may I have your appearance.

18          MR. PARRISH:  Yes, Your Honor, Felton Parish with

19  King & Spalding on behalf of BSG Clearing Solutions.

20          THE COURT: Ms. Cohen?

21          MS. COHEN: Thank you, Your Honor.  Leslie Cohen,

22  Liner, Yankelevitz, Sunshine, on behalf of PCS.

23          THE COURT: Mr. Miller, Timothy Miller?

24          MR. MILLER: Good afternoon, Your Honor, W.

25  Timothy Miller, Taft, Stettinius & Hollister on behalf of

1 Thermo Credit, LLC.

2 THE COURT: Ms. Horowitz?

3 Mr. Pardo?

4 MR. PARDO: Yes, Your Honor, Jim Pardo with King &

5 Spalding in Atlanta also for BSG Clearing Solutions.

6 THE COURT: Mr. Garfinkle?

7 MR. GARFINKLE: Yes, Your Honor.  I am authorized

8 to make an appearance now.  Jeff Garfinkle of Buchalter

9 Nemer on behalf of United On Line.  United On Line is a

10 secured creditor of PaymentOne as well as an unsecured

11 creditor of the parent, Billing Resources.

12 THE COURT: Mr. Mora?

13 MR. MORA: Good afternoon, Your Honor, Michael

14 Mora for the Federal Trade Commission.  Also with me is

15 Collet Guerard.

16 THE COURT: Welcome.  Mr. Chiang?

17 MR. CHIANG: Craig Chang, Buchalter Nemer.  Your

18 Honor, I'm not making an appearance.

19 THE COURT: Mr. Schneider:

20 MR. SCHNEIDER: Good afternoon, Your Honor, Jeff

21 Schneider from Tew Cardenas in Miami on behalf of the

22 Federal Receiver.

23 THE COURT: Mr. Coleman?

24 MR. COLEMAN: Good afternoon, Your Honor, Daniel

25 Coleman on behalf of Network Telephone Services.

1          THE COURT: One more time.  Leslie Horowitz?

2          Is there anybody on the phone whose name I have

3  not called?

4          Mr. Ahrens.

5          MR. AHRENS: Your Honor, as our papers reflect,

6  since the last hearing on interim use of cash collateral,

7  the Committee has been formed.  John Fiero of Pachulski

8  Stang represents the Committee and is present in court.

9          And as our papers further disclose, we had

10  approximately a five-hour meeting in person with the

11  Committee -- a few were the on the phone, but in person,

12  last week.  It was a very productive meeting, and we are

13  now in the process of drafting a term sheet on a Plan of

14  Reorganization with the Debtor.  So we're moving rapidly.

15  And the Committee is doing that term sheet with us.

16          Your Honor, there are a number of objections for

17  this simple two-week further continuance.  The Committee

18  has asked until they stipulate to a final use of cash

19  collateral to look at our budget.  Right now there's --

20          THE COURT: It's three weeks that you're asking

21  for.

22          MR. AHRENS: It's two or after -- two or after

23  November 2, and I don't know what that comprises.  It's

24  probably two and a half or three weeks.

25          THE COURT: I'm sorry.  Two weeks -- today is the

1  15th.  Two weeks from today would be the 29th.

2            MR. AHRENS: Then I'm wrong.

3            THE COURT: Right.

4            MR. AHRENS: It's some time after November 2.

5            THE COURT: Okay.

6            MR. AHRENS: And so we're asking for permission --

7            THE COURT: November 2 is a Friday, so the next

8  day would be -- I don't have that day but the next day

9  after November 2 would be November 5th and so that would be

10  exactly three weeks.

11            MR. AHRENS: My calculations are wrong.  I stand

12  corrected.

13            THE COURT: Okay.  I mean it's important just that

14  everybody understands what we're talking about.

15            MR. AHRENS: Yes.  So it's a three-week

16  continuance.  The Committee has stipulated to it.  And in

17  the meantime, the Committee is doing the normal things that

18  Committees do and that is, look at our books and records,

19  go over our budget, and talk to us, not only about the Plan

20  of Reorganization but also about where we're going in this

21  case and what we've done in the past.

22            And so for a simple three-week continuance, Your

23  Honor, we don't see why we had the slew of objections, but

24  I can understand in some respects that people had a time

25  and deadline to file an objection, and they didn't know

1  that we were meeting with the Committee or the results of

2  that meeting.

3       THE COURT: Or that you were only going to ask for

4  three weeks.

5       MR. AHRENS: And we were asking for a lot longer

6  period of time, and with the stipulation with the

7  Committee, it's now only three weeks.  But notwithstanding

8  that, we have only a few objections remaining, and with the

9  permission of the Court, what I'd like to do is go over the

10  stipulations that we've been able to reach since last

11  Thursday with the various secured creditors.

12       THE COURT: Very good.

13       MR. AHRENS: Your Honor, the first creditor is

14  PaymentOne, and PaymentOne has agreed to the cash

15  collateral order that we've attached to our papers in the

16  form that's attached, and just wanted me to put on the

17  record one stipulation and that is, the carve-out that

18  they've agreed to is a full carve-out from the beginning of

19  the case up to and including the final hearing.  So they

20  wanted to make clear on the record that they're not

21  stipulating to a carve-out on a final basis.  It's just

22  until whatever date this Court has set, November 3, 4 or 5,

23  whatever.

24       THE COURT: Okay.  But just so I understand, there

25  are two different things you're saying potentially.  One

1   is, until whenever the next hearing date is, and the other

2   is, until there's a final hearing, because it may well be

3   that you'll come in on November whatever it is and say we

4   want another two weeks or three weeks or four weeks.  Which

5   are they agreeing to?  Are they only agreeing to the next

6   hearing or are they agreeing until there's a final hearing?

7           MR. AHRENS: The next hearing.

8           THE COURT: Okay.

9           MR. AHRENS: Is that correct?

10          MR. WARREN: Yes.

11          MR. AHRENS:  Yes, and that's fine with us because

12  they know we are going to ask for a carve-out once again,

13  and so that's the agreement that the Debtor has with

14  PaymentOne.  And I think that also takes care of the U.S.

15  Trustee's objection because we got PaymentOne to agree to a

16  full carve-out, which includes a successor Chapter 7

17  trustee.

18          The next one that we have any agreement with and

19  an understanding is Ms. Diemer's client, POL.  We did make

20  one mistake in the budget, and we will be filing a

21  corrected budget after this hearing today.  We did omit a

22  payment that was due on November 1 to POL of approximately

23  $62,000.  We agreed at the last hearing to make that

24  payment, and we're agreeing again to make that payment, and

25  it will be in the cash collateral budget that we're seeking

1  approval today.

2         And with that understanding, I think Ms. Diemer

3  will withdraw her objection.

4         THE COURT: Could you pull the microphone to you

5  first?  And I'll ask everybody to do it.  We're on a

6  recording device.  The mikes need to be right in front of

7  you.

8         MS. DIEMER: Your Honor, yes, that is correct.  So

9  long as we have reached the agreement about the payment and

10  that the payment is included in the budget and will be

11  made, we withdraw our objection to the interim agreement.

12  Our stipulation which we will have to execute after this

13  hearing is to look as it did before.

14         THE COURT: Thank you.

15         MR. AHRENS: The next one, I think, we will not

16  have a fight with today, but maybe in the future, is the

17  receiver, Your Honor.  We have sought in our papers an

18  order of the Court today that the Court unblock the 1.7

19  million dollars.  We have suggested that the unblocking of

20  that account be resolved on Wednesday when similar issues

21  are coming up.  The receiver has complained to us that that

22  was not sufficient time.  We do need the money.  We've set

23  forth in our papers why we need the money.  I think it's

24  more appropriate to rule on that on Wednesday, but we have

25  agreed with the receiver that we will give the receiver ten

1 days advance notice before coming back to the Court asking

2 it to unblock the account, and he can make whatever further

3 points he wants, but --

4        THE COURT: So that's off the table for Wednesday.

5        MR. AHRENS: No, the unblocking of the account is;

6 the stay is not.  The stay is still going forward on

7 Wednesday.

8        THE COURT: I'm sorry.  The TRO -- the preliminary

9 injunction is going forward.

10        MR. AHRENS: Yes, that is going forward.

11        THE COURT: There's no stay, right?  We're talking

12 about the preliminary injunction.

13        MR. AHRENS: Exactly.  The preliminary injunction

14 is going forward on Wednesday --

15        THE COURT: But you're not going to ask him to

16 unblock the account.

17        MR. AHRENS: Not --

18        THE COURT: And so -- it's a little complicated,

19 isn't it, because if -- can I sever those issues so easily?

20 Can I --

21        MR. AHRENS: I don't think you can, and I think

22 the issues that you will be resolving on Wednesday -- and

23 that's why in our papers we had suggested that the whole

24 matter be decided on Wednesday.  We don't think you can

25 sever them.  But we feel that --

1    THE COURT: Maybe he would agree that there would

2   be an agreed cessation until the hearing, whenever it's

3   convenient to have the hearing, in other words, the

4   equivalent of a P.I., but not a P.I., by stipulation,

5   because it's a problem otherwise to have these bifurcated,

6   because they're related, I think.  If you could agree that

7   nothing will go forward against the Debtor for whatever

8   days it takes to provide the receiver with sufficient

9   notice of a hearing on the unblocking of the account, then

10  that would make sense to me, but otherwise, it's going to

11  be a little difficult to deal with, I think -- unless I

12  haven't analyzed it correctly.

13    MR. AHRENS: Your Honor, I think you are analyzing

14  it correctly.  The two are intertwined, and all I'm saying

15  is this.  We think that they've had sufficient time to

16  fully brief everything with respect to the preliminary

17  injunction, and we do want to go forward on Wednesday with

18  respect to the preliminary injunction.  And we think the

19  findings of the Court in connection with the preliminary

20  injunction will make it very easy for us to seek an

21  unblocking of the account if we prevail.  So all I'm saying

22  is that we want to go forward with everything on Wednesday,

23  and if --

24    THE COURT: But you've agreed not to.

25    MR. AHRENS: We've agreed only for one thing, as

1  to the unblocking of the account.  If he wants more time to

2  brief it or to bring it up, we'll give him ten days notice,

3  because we desperately need the money but we don't need it

4  in ten days.  And so I have agreed that as to the

5  unblocking of the account, we would give them ten days

6  notice.

7        THE COURT: So when I write my preliminary

8  injunction decision, it's going to be on the state of the

9  record at that time in which the 1.7 million is blocked.

10        MR. AHRENS: It would be blocked --

11        THE COURT: At that time, it's going to be

12  blocked, and the decision will have to take the facts as

13  they are, and that is, presuming there's a blocked account,

14  and the question is, how that will play in the next hearing

15  with the 1.7, whether we'll be back to the question of the

16  injunction or not, and I don't know the answer to it

17  because I haven't thought about it.  I thought they were

18  together, and so it was a little easier for me to think

19  about it that way, but I'll be honest with you, Mr. Ahrens,

20  I haven't really thought about bifurcating it, and Mr.

21  Sacks wants to talk to you, and so I'll go off the record a

22  minute.

23        MR. AHRENS: Yes, maybe if we could defer this --

24        THE COURT: Five-minute recess?

25        MR. SACKS: Why don't we pass this and come back

1   to it?

2           THE COURT: Okay.

3           MR. AHRENS: That's a good suggestion because I'll

4   just tell you my thoughts.  My thought is everything that

5   we needed to prove we're going to prove on Wednesday with

6   respect to unblocking the account.  So I thought if you

7   made a finding, it would be preclusive on them with respect

8   to those matters.  But maybe now rather than struggling --

9           THE COURT: Let me just say my question.  I mean

10  what if I found that you didn't need the money in ten days,

11  that you could survive without the money, and is it really

12  binding?  Is there anything that I've decided on Wednesday

13  that's going to be related to that?  I don't know.  I

14  just -- I need time to think about it.

15          MR. AHRENS: The Court has some good points, so

16  let me talk to my partner who's handling this aspect of the

17  case and we'll take a recess after we go through the other

18  ones.

19          THE COURT: See, I think you don't need a

20  preliminary injunction if they'll agree to stay everything

21  for as long as they need to set up the 1.7 issue.  If

22  they'll agree that everything is stayed, vis-a-vis the

23  Debtor in Florida, then you don't need a preliminary

24  injunction.  They could stipulate to a continuation of the

25  status quo for enough time to give them whatever time they

1   need to brief the unblocking issue, and if they will agree

2   to that, then it may make more sense, but I may be wrong,

3   and they may be bifurcatable as you apparently think they

4   are.  So let's -- I'll defer consideration.  I just wanted

5   to get my thoughts on the record early.

6         MR. AHRENS: Thank you, Your Honor, we'll take

7   those thoughts into consideration and discuss them with the

8   receiver's counsel during the break.

9         THE COURT: And understand, it's not that I'm

10  convinced.  I just haven't thought about it enough.

11        MR. AHRENS: Thank you, Your Honor.  Your Honor,

12  we still have objections that are unresolved with Public

13  Communications, Personal Voice, Thermo Credit, and the FTC.

14  And with respect to each of those, we fully briefed our

15  reply to every one of those.

16        THE COURT: But you're not -- the FTC isn't going

17  to object because you're not going to use their 1.7 million

18  for the three weeks, right?  Until this hearing, so that I

19  don't understand what that means, the FTC is objecting.

20        MR. AHRENS: They did file an objection --

21        THE COURT: Right.  But Mr. Mora, if we're

22  agreeing not to pull out the 1.7 million right now for the

23  purposes of today's hearing, you really have no objection;

24  isn't that right.

25        MR. MORA: Well, what we understood, Your Honor,

1  was that these issues would all be entertained at the P.I.

2  hearing on Wednesday.

3        MR. AHRENS: Yes, Your Honor, and that's –- I

4  think that's where we're going to end up, Your Honor, after

5  the comments of the Court, so maybe we should just defer

6  that too.

7        THE COURT: Okay.

8        MR. AHRENS: And with respect to the remaining

9  three, Public Communications, Your Honor, and we fully

10  briefed our response there.  Maybe I'll just briefly

11  summarize our response to each of those three.  Public

12  Communications never filed a UCC-1 as a secured creditor,

13  and their objections we've replied to, Your Honor.  There

14  is no UCC-1 with respect to them.  But as to each of these

15  three, they're receiving adequate protection for the next

16  three weeks, if they do have a lien.

17        Personal Voice, Your Honor, they have a UCC-1 on,

18  quote:

19              "All collected amounts due and owing to Personal

20              Voice pursuant to that certain billing services

21              agreement."

22  So they basically have a security interest in what they're

23  entitled to receive.  They don't have a security interest

24  in any assets of the Debtor.  And their UCC-1 lapsed.  So,

25  Your Honor, but once again, you know, we think they're

1   getting adequate protection if they do have a valid

2   security interest.

3           And lastly, Thermo Credit, we fully analyzed that

4   in our brief, and we have shown that they are a factor of

5   ICS, our affiliate, but they don't have a security interest

6   in any of the assets of the Debtor.  But once again, if

7   they do have any claims or security interest, they're

8   getting a replacement lien to the extent of the validity.

9           THE COURT: Okay.  Let me just say one more thing.

10  I'm stuck on this other problem, but I understand your

11  position, and I'll let the objecting creditors have a

12  little time too.  If you don't need the money for ten days,

13  then you probably don't need the money for three weeks, and

14  all of this could be deferred until after the three weeks,

15  if you can work out an interim step like you worked out for

16  today.  So why you're going to have hearings in eleven days

17  instead of 21 days doesn't make any sense to me.  You could

18  have an omnibus hearing and us, the Committee, and you, and

19  everybody else, will have three more weeks to maybe even

20  come up with a draft plan, maybe come up with something.  I

21  don't know what you're going to come up with, but I don't

22  understand why you'd want to have the litigation in ten

23  days and then again, you know, eight days later.  So I'm

24  not asking for you to respond.  I'm just telling you that

25  seems to be my thought at this point, and I'll let you talk

1  to Mr. Sacks and the other parties about that.

2      With respect to any remaining objecting creditor

3  to the use of cash collateral, could you first identify

4  yourself and I'll give you each a few minutes to respond.

5  Counsel in the courtroom first.

6      MS. CORDELL: Delores Cordell, Your Honor, on

7  behalf of Thermo Credit.  We have objected to the continued

8  use of the cash collateral, and there's several things I've

9  heard even in the courtroom today that concern us very

10  much, the first one being that the Debtor is now saying

11  they, quote, "desperately need" the 1.7 million.

12      THE COURT: Well, not so desperate because they're

13  going out ten days and they may go out 20, and so maybe you

14  should wait and find out whether they really need it,

15  because they may not need it for three weeks anyway.

16      MS. CORDELL: But for three whole weeks, Your

17  Honor, yes.  Well, we've already -- we're already four

18  weeks into this --

19      THE COURT: Right.

20      MS. CORDELL:  -- this entire matter.  However,

21  I'm also very disturbed by the fact that, I sat in this

22  courtroom at the last hearing along with the other 27

23  attorneys and heard the Debtor's counsel say very clearly

24  that 50 percent of the payments that came in would be made

25  to creditors such as Thermo Credit.  That has not happened.

1  And we have no explanation for that except an e-mail this

2  morning from Ken Dawson saying, oh, we're waiting for an

3  order of the court and approval of the Creditors'

4  Committee.  Our understanding was that was a done deal at

5  the last hearing.

6           THE COURT: All right.  Let's stop.  Let's find

7  out the answer to that.  Stay where you are.

8           MR. AHRENS: Here's the answer.  My client was

9  also very frustrated that he could not make payments under

10 the pre-payment plan because I stood here and said we do

11 not need court approval.  We could do this immediately.

12 However, we had no ability to use cash until now because

13 the cash collateral budget that was approved at the last

14 hearing did not include the use of cash for the payment

15 plan.  The Committee met with us for over five hours and it

16 has been approved.  So if the Court enters an order today,

17 approving the use of cash, which includes as a line item

18 one of the pre-payment plans, it's going to be

19 retroactively implemented from the filing of the petition

20 until now.  And the cash budget does clearly include that,

21 and so your client will start receiving payments in

22 accordance with that plan after the Court enters the order.

23          THE COURT: And you're going to immediately make

24 up the payments that were due?

25          MR. AHRENS: Exactly, Your Honor, back to the

1  petition date.  The problem was when we met here last time,

2  we had no authority to use cash at all, and then the budget

3  that we presented did not include that.  And so I thought

4  of coming in on an emergency basis, but we met last

5  Wednesday.  The Committee approved it on Wednesday.  We

6  finalized the budget on Thursday.

7          THE COURT: I wasn't here anyway.

8          MR. AHRENS: Okay.

9          THE COURT: I told you I was going to the National

10 Conference of Bankruptcy Judges.

11         MR. AHRENS: That's right.

12         THE COURT: And that's what I did, and I want you

13 to know you were all sorely missed.

14     (Laughter.)

15         MR. AHRENS: We were back here working on this

16 case, Your Honor.

17         THE COURT: I know what you were doing.  I assumed

18 that.

19         MR. AHRENS: So, Your Honor, we now will be able

20 today, if the cash collateral order is entered, to make

21 those payments.  I don't mean today, I mean we would make

22 them --

23         THE COURT: As soon as the order is entered, you

24 can make the payments.

25         MR. AHRENS: Yes, in accordance with the pre-

1  payment plan that's attached to the Dawson declaration.

2          MS. CORDELL: Okay.  So that would be immediate

3  payment upon entry of the order.

4          THE COURT: Upon the Court signing the order.

5          MS. CORDELL: All right.  All right.  There is --

6  we're still very concerned though that this is a wasting

7  asset right now, given the status of it.

8          THE COURT: Well, do you think a liquidation would

9  be better?  Or you don't know.

10          MS. CORDELL: Well, we have 3.4 million dollars

11  out there, Your Honor, and we're watching it disappear

12  slowly, if not quickly, and that's what concerns us.  But

13  these issues have been briefed by many parties on this

14  already.

15          THE COURT: I understasnd.

16          MS. CORDELL:  However, at this point, however,

17  Thermo Credit has the 3.4 million plus additional accounts

18  that have been taken over for collection.  These are not

19  assigned to the Debtor.  These are accounts that the Debtor

20  is simply collecting.

21          What we believe is the most important thing to do

22  is to preserve those funds so that once -- we're filing an

23  adversary proceeding that will be filed today or tomorrow,

24  and the issue of whether we are a secured creditor will be

25  taken up at that point.  However, in the meantime, we're

1  watching our money -- what we claim is our money --

2  disappear.  And we would request that the funds that are

3  due to Thermo Credit be segregated at this time as well, so

4  that we're assured that when we get to the end of this

5  road, that there is going to be the money that's owed to

6  our client.

7          The Debtor is simply collecting this as an

8  agent --

9          THE COURT: Are you saying that the Debtor should

10 segregate what, exactly.

11         MS. CORDELL: The funds that they're receiving --

12         THE COURT: Prospectively?

13         MS. CORDELL: Prospectively, yes.  Well, we'd like

14 to have it all -- we believe it is appropriate also to

15 segregate those funds for the pre-petition debts because

16 those were accounts --

17         THE COURT: All the commingled funds.

18         MS. CORDELL: Your Honor, all of those funds are

19 easily traceable because the Debtor has very extensive and

20 complex software where they can trace those funds.

21         THE COURT: Do you mean trace or account for?

22 Trace means that they're separate funds.  Trace doesn't

23 just mean account for the number.  Trace means to identify

24 specific dollars that were segregated essentially.  It's

25 like a constructive trust theory.  It's not, figure out

1  what the amount that -- the dollar amount is.  That's not

2  what trace means.

3          MS. CORDELL: Well, Your Honor, they're --

4          THE COURT: You're talking -- if you distinguish

5  between account for and trace --

6          MS. CORDELL: I would not be able to distinguish

7  that at this point, Your Honor.  I haven't looked into that

8  issue.  However, the fact is that all we're talking about

9  is there are billing transaction data that's sent to ICS --

10 to the Debtor and they are acting essentially as just, you

11 know, they're just funneling the money through.  They're

12 not a factor; we're not a factor to the Debtor.

13         THE COURT: Okay.

14         MS. CORDELL: But we feel that we are a secured

15 creditor.  These funds should be segregated so that we can

16 have the money available to us when this whole matter is

17 resolved, this bankruptcy is resolved.

18         THE COURT: Thank you, counsel.

19         Who would like to speak next?  Mr. Little is in

20 the courtroom and he's going to approach the bench for

21 those on the phone.  And again say whom you represent.  I

22 know it's Personal Voice, Inc., but say it.

23         MR. LITTLE: Yes, sir.  Thomas Little representing

24 Personal Voice, Inc.

25         THE COURT: Go ahead, sir.

1    MR. LITTLE: Thank you, Judge. Your Honor, my

2  client has some of the same concerns that were echoed by

3  Thermo Credit, and in addition, Judge, we believe that an

4  important issue is that these funds that my client remits

5  for billing and collection are simply not property of the

6  bankruptcy estate under 541. They belong to Personal

7  Voice, and therefore they're really not even cash

8  collateral, and the issue of the UCC may or may not apply.

9  It's simply not the Debtor's funds. The Debtor was merely

10 a collection agent and in essence, now the Debtor wishes to

11 utilize Personal Voice's funds and others' funds to operate

12 its business. The accounts receivable that are being

13 offered as the replacement lien, we don't really have a, I

14 don't believe, a great deal of data as to the true value of

15 those accounts receivable, and how protected is my client

16 for adequate protection.

17    Judge, my client was receiving about $40,000 on

18 the average per week pre-petition and had approximately 1.9

19 million dollars in the pipeline, so to speak, when the case

20 was filed. Those funds are collected each week, and the

21 Debtor proposes to utilize those funds to assist in the

22 operation of its ongoing business enterprise. And I think

23 also one thing we haven't heard today that I'm aware of is

24 I believe at the last hearing there were discussions that

25 the subsidiary may be sold. A potential buyer was

1  potentially imminent, and that may generate sources of

2  funds to resolve a number of problems.  But I haven't heard

3  anything about where we stand on that particular issue or

4  if that's even available now or being considered now as

5  part of a plan.

6          THE COURT: Mr. Ahrens, is that being considered

7  as part of a plan?

8          MR. AHRENS: Your Honor, the type of plan that

9  we're talking about with the Committee is an ongoing

10 reorganization.  How PaymentOne fits into that plan is

11 still under discussion with the Committee, all of whom

12 signed confidentiality agreements.  And there are some

13 confidential matters with respect to that, so all I can say

14 is the Committee has been extensively apprised of exactly

15 where we stand with the sale of PaymentOne and we would

16 prefer at this time to keep it that way until we have more

17 meetings with the Committee in the next week or two.  But,

18 yes, PaymentOne is absolutely part of the Plan of

19 Reorganization and part of our plan.

20         THE COURT: But you haven't decided whether to

21 sell it.

22         MR. AHRENS: That's correct, Your Honor.

23         MR. LITTLE: Thank you, Judge.  Well, I guess,

24 another thing, Your Honor, we're looking at is the $40,000

25 a week that would have been collected, as further adequate

1  protection, to have those funds set aside pending a final

2  determination of what's going to be appropriate for cash

3  collateral and whether on the arguments of the Debtor or

4  Personal Voice, those are really property of the estate

5  appropriate for the Debtor to be using.

6        THE COURT: How am I going to resolve the property

7  of the estate issue?  How are you going to set it up?

8        MR. LITTLE: Well, Judge, I think we'd have to

9  file an adversary proceeding for a determination as to

10  whether or not the funds that were generated by the Debtor

11  through the billings of Personal Voice, Inc. are actually

12  property of the estate under 541(a).  And then the Court

13  would, after hearing appropriate evidence, have to make a

14  decision at that point as to whether or not those funds

15  were property of the estate which would be subject to any

16  utilization by the Debtor.

17        THE COURT: And when do you anticipate doing that?

18        MR. LITTLE: I believe we could have that

19  accomplished in the next ten days, Judge.

20        THE COURT: I'm not pushing you.  I'm just trying

21  to get an idea, you know, what my work load is going to be,

22  what you're going to do.

23        MR. LITTLE: Yes, sir.

24        THE COURT: I'm not encouraging you to do it or

25  not do it.  I'm just listening.

1          MR. LITTLE: Yes.

2          THE COURT: Thank you, sir.

3          MR. LITTLE: Thank you, Judge.

4          THE COURT: Does anybody else wish to speak in

5    opposition to the use of cash collateral?

6          MS. COHEN: Yes, please, Your Honor.  On the

7    telephone Leslie Cohen.

8          THE COURT: Yes, Now Ms. Cohen, I can barely hear

9    you.  So first, are you on a hand set?

10         MS. COHEN: Yes.  Is that better?

11         THE COURT: A little better, yes.  If you could

12   please talk directly into your phone and talk loudly so

13   everybody in the court can hear you.

14         MS. COHEN: Thank you very much, Your Honor.

15   That's more clear?

16         THE COURT: It's not bad.  It's not great, but

17   it's not bad.

18         MS. COHEN: Okay.  All right.  Well, thank you,

19   Your Honor, for the opportunity to speak.  At the last

20   hearing what we had done was to have agreement where the

21   Debtor segregated $14,000 per week which would be just held

22   pending a further determination, and frankly, Your Honor,

23   it might be something very much along the lines of what Mr.

24   Little just talked about by way of an adversary proceeding,

25   maybe an objection to claim, and we really haven't sorted

1  that out yet.  I do understand that this is only a short

2  term matter, only until maybe three weeks from now, and

3  we're asking for the exact same thing again.

4       Our thinking is this.  We understand that the

5  Debtor is claiming that PCS is not perfected and we put

6  some discussion of that in our papers, but we really don't

7  think today is the day for Your Honor to decide that.  We

8  recognize we're kind of a small fish in the pond because we

9  know we're not that much money in the scheme of things, but

10 if we would just be able to have this money segregated

11 subject to further determination, which at 14,000 a week

12 would be about 42,000, then we withdraw our objection at

13 this time.

14      Just a little bit about the substance of our

15 objection, we question if this is cash collateral or

16 whether it's our property again.  I won't repeat Mr.

17 Little's argument, but there is that issue, and then if it

18 is cash collateral, then we don't believe we're getting

19 adequate protection.  The history -- and I'll do it very

20 briefly -- is that our deal was actually with PaymentOne.

21 We had contracted with them in the first place, and now

22 PaymentOne pushed our account over to Integretal, and then

23 Integretal went into the bankruptcy and now our money is

24 getting thrown right back to PaymentOne and yet nothing to

25 PCS.

1    So we all knows the rules of the game in

2  bankruptcy, and we know that, you know, there's some of

3  that where, you know, creditors have to wait, but given the

4  circumstance and given our security interest, and the other

5  issues as raised in our papers, and frankly, Your Honor,

6  too, that I think we're relatively small in the scheme of

7  things, we would ask only for the segregation of the

8  $42,000, or that is 14,000 per week until the further

9  hearing to get these issues resolved.

10    And I would also add, Your Honor, I have

11  approached the Debtor as well as the Committee about

12  whether we could reach some sort of an overall resolution.

13  We'd like to do that too.  But again, I know today is not

14  the day for that.

15    Thank you.

16    THE COURT: All right.  Do you oppose the

17  segregation of those funds?

18    MR. AHRENS: Yes, Your Honor.  Would you like me

19  to address that?

20    THE COURT: Sure.

21    MR. AHRENS: Can I remain sitting down?  It seems

22  like this phone is better.

23    THE COURT: You can always remain sitting.

24    MR. AHRENS: Thank you, Your Honor.  Your Honor,

25  Public Communications has made the request; Personal Voice

1   has made the request, and there are others who have not

2   made any requests at all.  We agreed to it last time

3   because it was the end of a long hearing.  A committee had

4   not been appointed, and it was only 14,000 as Ms. Cohen

5   says.  But now to require a segregation for somebody -- and

6   I agree today is not the day to object to or to test her

7   security interest or the security interest of Personal

8   Voice or Thermo Credit.  But we bring to the Court's

9   attention the invalidity of those, because you see how

10  quickly we did a deal with POL when they had a valid

11  perfected security interest.  And the Committee has

12  supported that deal with POL.

13          But now that we have a Committee formed, they

14  too have I think come to the same conclusion that I have

15  that these are imperfected security interests, and so the

16  Court can certainly take that into consideration.  But we

17  don't think we should be giving even $14,000 to Public

18  Communications because it's unfair to Personal Voice,

19  Thermo Credit and others such as Network Telephone is on

20  the phone represented by Mr. Coleman, as I heard.  So it's

21  unfair to Network, who's cooperated with us, and not sought

22  any more of a segregation and they've been reasonable, and

23  it's time to just say their protection is -- if they do

24  have a lien which I don't think they do -- in the remaining

25  assets.

1          THE COURT: And if they do, it's adequately

2     protected.

3          MR. AHRENS: We believe it's adequately protected.

4     Now as to the fight over whether or not Personal Voice has

5     assigned or hasn't assigned it, we put a declaration in

6     from Mr. Dawson that said they, just like everybody else,

7     have to assign it so that we can collect it.  But again, we

8     know that one declaration does not a trial make, and so

9     it's not being decided today.  But we do think the

10    invalidity arguments of the Debtor are appropriate to be

11    considered, and the support of the Committee of our

12    position now that the Committee has been formed in allowing

13    another three weeks use of cash collateral.

14         THE COURT: One declaration does a trial require.

15         (Laughter.)

16         MR. AHRENS: That's correct.

17         THE COURT: If it's contested.  Okay.  So Mr.

18    Fiero, what's your analysis of these three creditors'

19    claims?

20         MR. FIERO: Your Honor, in the brief time we've

21    had to take a look at it, we see no reason not to agree

22    with the Debtor.  We believe that these creditors are

23    adequately protected by --

24         THE COURT: Do you believe they're secured or

25    unsecured in the first instance?

1    MR. FIERO: Your Honor, we don't have any evidence

2  to suggest that they're secured.  Just with respect to

3  Personal Voice, I notice that it specifically says that the

4  Debtor won't be a trustee or fiduciary for the parties

5  submitting records, and that suggests to me that you've got

6  a standard unsecured creditor type transaction with a

7  simple right to payment, the same way you have a right to

8  payment when you deposit money with the bank, Your Honor.

9  And for that reason, we believe that all creditors should

10  be treated equally and that the adequate protection that's

11  offered is sufficient at this time, and the rest of the

12  money ought to be available to run the Debtor's business.

13    THE COURT: Okay.  Does anybody else wish to say

14  anything?

15    MR. WARREN: Your Honor, Stephen Warren of

16  O'Melveny & Myers on behalf of PaymentOne.  I just wanted

17  to put a little bit of a gloss on Mr. Ahrens' comments

18  regarding the stipulation.  The provision that he was

19  talking about that we've clarified is paragraph 7 of the

20  stipulation that deals with the agreement to subordinate

21  with respect to attorney's fees and other fees in the case,

22  and as Mr. Ahrens said, that runs through the period of the

23  next hearing and not beyond.  We'll have discussions, as I

24  understand, between now and then, about the go forward,

25  along with the other issues presented in the stipulation.

1        With that clarification, PaymentOne supports the

2  continued use of cash collateral through the hearing date.

3        THE COURT: In his papers, the receiver says that

4  the ownership issue is not predicated on whether the FTC

5  ultimately prevails in the enforcement action against the

6  Debtor, and the turnover provisions of the omnibus

7  clarification orders are final appealable orders.

8        Let's assume for a moment that the FTC doesn't

9  prevail in the enforcement action, where would those funds

10  go?  Is that a question properly addressed to Mr. Mora or

11  to you Mr. Oetzell?

12        MR. OETZELL: We'll start with Mr. Mora?

13        THE COURT: Mr. Mora, he's thrown the ball into

14  your court.  Do you want to handle it or throw it back?

15        MR. MORA: I'll take a stab at it, Your Honor.

16        THE COURT: You've mixed the metaphor.

17        MR. MORA: For sure.

18   (Laughter.)

19        THE COURT: And I'll take a stab at a ball.

20        MR. MORA: Your Honor, if the FTC does not prevail

21  on the merits on liability, then there would be no monetary

22  relief grounds, and --

23        THE COURT: Right.  But if you already had 1.7

24  million dollars, then what happens?

25        MR. MORA: Well, on this I would have to pass the

1  buck to the receiver's counsel, but I can tell you what I

2  presume would happen is that it would all be under the

3  District Court's control of course.

4       THE COURT: Will the District Court would get to

5  decide who gets its?

6       MR. MORA: The District Court could order a

7  winding down of the receivership, and then the receiver

8  would have to resolve issues as to the distribution of any

9  funds that were in the receivership estate.

10      THE COURT: I don't understand what that means.

11 If you're found not to prevail, where does the money go?

12      MR. MORA: Your Honor, can I consult with my co-

13 counsel for one moment?

14      THE COURT: Sure.  They're talking so don't say

15 anything.  I don't even know if they can hear us.

16      MR. MORA: We can.

17   (Pause.)

18      THE COURT: I think Mr. Oetzell wants to say

19 something before you say something, so whenever you're

20 ready to hear Mr. Oetzell, let me know.

21      MR. MORA: Ready, your Honor.

22      MR. OETZELL: Your Honor, I'm suggesting that

23 these are tied up in the issues that we're gong to be

24 adjourning for, for "X" number of minutes, and I would ask

25 the Court if we just go ahead and adjourn for a little

1   while and we'll come back with your answers.

2           THE COURT: Okay. The Debtor asserts in its reply

3   that based on the services of FTI Consulting, that the

4   funds in the blocked account are needed and Debtor can't

5   remain administratively insolvent if the Debtor has to pay

6   a million dollars in fees to defend the Florida action and

7   litigate with the receiver. But it seems like based on the

8   Debtor's budget, that the Debtor could operate through the

9   next cash collateral hearing if the 1.7 were left in the

10  blocked account, and so the question is, is that true. And

11  then is it true if I grant a preliminary injunction, and is

12  it true if I don't grant a preliminary injunction. Again,

13  you don't have to answer it. I'm going to break, but I

14  want you to be thinking about these things, and I know that

15  they to some extent relate to Wednesday.

16          Now, let me just say one other thing, and that

17  is, if I grant a preliminary injunction, I'm considering

18  whether it would be appropriate to grant a preliminary

19  injunction of limited duration, and so you should face that

20  issue too. For example, should I -- you know, we seem to

21  be at an active stage of the case where the Committee and

22  the Debtor are talking about a possible kind of

23  reorganization. But all that's going to play out fairly

24  soon. At least we'd have a much better handle on the

25  status of the case and the reorganization, and so one of

the things I'm considering is should I grant a preliminary
injunction of 90 days, of 120 days, of six months?  Should
I grant a preliminary injunction of a longer period than
that, and all of that is up for discussion and
consideration by the Court.  It may be that a preliminary
injunction of 90 days would be -- if I decide I have the
power to do it, and I'm going to do it, might be a good way
to go, and I'd like to make sure that you're prepared now,
even though we're going to talk about this after the break
and we're going to talk about this on Wednesday, I don't
want to hit you blindsided with that idea, and I'm
particularly interested in the Debtor, the FTC -- but also
the Creditors' Committee's view of that possible idea as
well.

        The other thing I'm frankly wondering, and you
don't need to answer this, but I'm wondering whether, if
the Committee and/or some of these other creditors are
planning to make an appearance in Florida to try to explain
to the Florida District judge whatever they think is
appropriate to explain about the bankruptcy and about the
way the bankruptcy works and about whether or not, for
example -- well, whether the receiver's claim and the FTC's
claim should or should not be elevated above other
creditors' claims.  And of course, we still have this
outstanding enforcement action which may go either way.  It

1 may be that that would be useful.  It may not.  I just

2 don't know what the thoughts are of the parties on making

3 an appearance in the Florida Bankruptcy Court would be.

4         I'm prepared to take a recess and in the meantime

5 I'm going to have to think about my decision on the use of

6 cash collateral in the narrow sense, with respect to the

7 three objections that are outstanding.  And I'm correct,

8 the three people who spoke are the only outstanding

9 objections that I have to deal with; is that correct?

10         MR. AHRENS: Yes, Your Honor.

11         THE COURT: Okay.  So I'll be thinking about that,

12 and you take whatever time you need to discuss the issues

13 that we've discussed and I assume Mr. Oetzell, you'll be in

14 touch with Washington?

15         MR. OETZELL: Yes, Your Honor.

16         THE COURT: Thank you, sir.

17         MR. AHRENS: Thank you.

18         THE COURT: Court is in recess.

19         THE CLERK: Please rise.

20     (Whereupon, a recess is taken at 2:54 p.m., and the

21 court is reconvened at 3:26 p.m.)

22         THE CLERK: Please rise.

23         THE COURT: Thank you.  Please be seated.  Go

24 ahead, Mr. Ahrens.

25         MR. AHRENS: Yes, Your Honor.  We have talked

1 amongst ourselves and with counsel for the receiver, and

2 came to the conclusion maybe we're just trying to be too

3 nice because the Court is right.  We think we ought to go

4 forward on Wednesday, and if the receiver contends that he

5 has not received enough notice -- we think he has, as I

6 said originally -- that's a point that he can make on

7 Wednesday.

8 　　　　　But it is very important that we go forward, and

9 one of the reasons is, confidence in the customers that we

10 have here.  As Mr. Weber said in his declaration, pre-

11 petition, we owe more than we can pay, Your Honor.  We did

12 not save all the money that we owed to our customers, and

13 that's why we're in bankruptcy.  And he said, post-

14 petition, he testified in his declaration:

15 　　　　　"... that it is prudent that this Chapter 11

16 　　　　　Debtor retain sufficient cash at all times to

17 　　　　　cover not only its operating expenses but its

18 　　　　　administrative obligations to its customers to

19 　　　　　remit funds to them with respect to post-petition

20 　　　　　transactions."

21 　　　　　And, Your Honor, we can do that, and we can do

22 that if we win on Wednesday, but now is not the time to

23 argue it, and I'm just saying the Court is correct, they

24 are connected.  We were trying to give them more time to

25 brief that subject, but again as I said, we were being too

1  nice, and so we would like to go forward on Wednesday on

2  the whole stay motion –- I keep saying stay –- on the whole

3  motion for an injunction.

4          THE COURT: Okay.  I'll address that in a second.

5  I've been working on the cash collateral matter, and so I

6  want to put this on hold for a second and switch to cash

7  collateral.

8          MR. AHRENS: Fine, Your Honor.

9          THE COURT: Okay.  You can stand or sit, wherever

10  you're most comfortable.  What is your argument, vis-a-vis

11  the property of the estate issue?  The argument has been

12  made by –-

13          AHRENS: Yes, Your Honor, by Personal –-

14          THE COURT: Well, it was made by one, and then Ms.

15  Cohen I think you know agrees, but how do you deal with a

16  541 issue first and then what would do I have to decide to

17  allow you to go forward on cash collateral if I'm so

18  inclined, vis-a-vis the 541 issue, because –- do I have to

19  have a trial and determine whether it is or isn't property

20  of the estate before I approve the use of the cash

21  collateral?  Is the standard that I have to find that it's

22  not likely property of the estate?  What kind of –- what

23  does the Court have to do before it allows you to use these

24  funds in the face of an argument that the funds are not

25  property of the estate, what does the standard and what do

1 I have to find?

2       So now I'll give you a little -- you pulled out a

3 book which suggests that you're about to research this, so

4 now we'll switch back to the other issue, and I'll take a

5 recess and let you go find out the answer to that one,

6 because that's very important as to what I have -- what

7 kind of findings I have to make and what kind of standard I

8 have to apply in dealing with a creditor, albeit likely an

9 unsecured creditor, that raises the property of the estate

10 issue.

11       So now you put down your book.  We're going to

12 switch gears.  I mean if you had an answer off the top of

13 your hear, we could have done that, but I think we'd be

14 better off if we let you do your research.  And where's Mr.

15 Rehfeld (Phonetic) when you need him --

16    (Laughter.)

17 -- and so now -- pardon me?  Can Mr. Sacks research --

18 so --

19       MR. AHRENS: I think I know the answer, but ask

20 your next question, Your Honor.

21       THE COURT: All right.  Now we're switching gears.

22 Is there any way that you can agree for three weeks if they

23 can hold the funds, a million-seven, for three weeks to put

24 everything on hold so that you can have a combined

25 preliminary injunction hearing and a motion to free up the

1  cash collateral simultaneously.

2        MR. OETZELL: Your Honor, if I might, I'm going to

3  answer that, and in answering that, I would like to answer

4  the question that I deferred to Mr. Mora, because I think

5  it has a determinative effect or at least I think Your

6  Honor would benefit in his decision from the answer.  And

7  the answer is consistent with every pleading that we have

8  filed.  It's consistent with every position that we have

9  taken, and it is consistent with every order that is

10  presently before this Court.  The answer is, if as between

11  the FTC and Integretal, the FTC loses, those funds, at 1.7

12  million dollars, still go to the receiver.  The District

13  Court has determined that those funds belong to Access One

14  and Network One.  They've committed a massive fraud --

15        THE COURT: Wait a second.  Is that greater than

16  Access One and Network One -- is that the name of that --

17        MR. OETZELL: That is correct, Your Honor.  Those

18  are --

19        THE COURT: Is that greater than them having a

20  judgment?

21        MR. OETZELL: It is their funds, Your Honor, that

22  is greater than them having a judgment.  The orders are

23  merely reflective of reality.  Those are their funds.  Now

24  if Integretal wins as against the FTC, those funds still

25  remain Access One's and Network One's.  They still remain

1  the receivers.  If Integretal loses against the FTC, then

2  absent a bankruptcy, it would be putting up new funds.  So

3  those funds are the property of the receiver, and that's

4  what was determined by the District Court.  And, Your

5  Honor, that's perfectly consistent with what we have put

6  forth in our papers and what we will be arguing about on

7  Wednesday, that there are two proceedings here.  There's

8  the FTC proceeding where they are deciding Integretal's

9  complicity in this fraud, and there is the contempt

10  proceeding in which our receiver participates.  The

11  contempt proceeding is to turn over the funds that this

12  Court has determined are property of Access One and Network

13  One and will remain --

14          THE COURT: Not this court.

15          MR. OETZELL: No, Your Honor.

16          THE COURT: You said "that this court has

17  determined."

18          MR. OETZELL: Did I say "this court"?  I mean the

19  District Court, Your Honor, has determined clearly,

20  unambiguously, are the property of Network One and Access

21  One and the property of the receiver, and also clearly and

22  unambiguously has decided in an order, post-petition and

23  knowing fully about this cash collateral motion that they

24  are not the Debtor's funds, that they are not property of

25  the estate.

1          Now, with that in mind, Your Honor, the answer

2     about the stay is, there's nothing that we can do about

3     that.   That is in the hands of the District Court.  We have

4     already asked the District Court for the one stay in

5     accordance with our agreement three weeks ago.  The

6     District Court hasn't even granted that yet.  My

7     understanding is usually the District Court is quite quick

8     with that, but it has not granted that.  And we are not in

9     the position to, shall we say, bargain for the District

10    Court at the moment.

11          THE COURT: No, of course not.  But you could say

12    that you'll request the District Court just like you

13    requested it before.  You either will or you won't.

14          MR. OETZELL: We're not in a position to do that,

15    I'm sorry, Your Honor.

16          THE COURT: So now, if you're not, then it seems

17    to me you put everybody in a position of having to go

18    forward Wednesday with everything.

19          MR. OETZELL: Well, Your Honor, certainly the

20    Debtor is free to go forward with the preliminary

21    injunction hearing, and since Your Honor sua sponte called

22    both the FTC and the receiver in, then we go forward on

23    Wednesday with it.

24          THE COURT: I'm sorry.  I sua spone did what?

25          MR. OETZELL: If Your Honor recalls, you were

1  deciding the issue as to whether the FTC should be subject

2  to a TRO, and then you said, no, there was insufficient

3  evidence, but there is sufficient evidence to bring them in

4  on a preliminary injunction --

5          THE COURT: To set a preliminary injunction

6  hearing.

7          MR. OETZELL: Right.  And then, you know, I was on

8  the phone as an observer, and you said, and oh by the way,

9  get us the receiver as well.  So the answer is yes, we will

10 be in on Wednesday to argue that.

11         THE COURT: Could I just clarify, wasn't the

12 Debtor seeking an injunction against the receiver and the

13 FTC on the TRO, and then all I did was say, no TRO, but

14 yes, we're going to have a P.I. hearing.  I wasn't aware

15 that I brought in a new party.

16         MR. OETZELL: No, you did not bring in a new

17 party, Your Honor.

18         THE COURT: I just -- I just said no TRO, but

19 we're going to have a P.I. hearing.

20         MR. OETZELL: Right.

21         THE COURT: They had asked for a TRO and a P.I.,

22 and so I said no TRO; we'll have a hearing on the P.I., and

23 that's all I did.  I scheduled a hearing on the P.I.

24         MR. OETZELL: Yes, Your Honor, and we will be

25 going forward on Wednesday.

1          THE COURT: So I didn't do anything sua sponte.

2          MR. OETZELL: But what I'm trying to say, Your

3   Honor, is that there is nothing conceptual, and there is

4   nothing factual that requires you to decide the unblocking

5   of the account on Wednesday.  There's nothing that

6   necessarily links them together.  There's nothing

7   conceptual because the Debtor is under a District Court

8   order to turn over the funds or show cause.  If the

9   receiver is restrained, those orders still exist.  Those

10  duties still exist.  The compulsion still exists.  There's

11  nothing that staying us will do in respect of the

12  proceedings in the District Court.  Those proceedings are

13  largely complete.  There is an order.  There is an order

14  requiring the Debtor to turn over the property or show

15  cause why it should not be held in contempt.

16          So the unblocking of the funds will only

17  complicate matters.  It does not have to be decided at that

18  particular time.

19          THE COURT: Well, stop a second.  Let's -- are you

20  going to move to a different point?

21          MR. OETZELL: Yeah.

22          THE COURT: So let me -- I want to -- Mr. Ahrens

23  is turning red, and so I'd like to know what he has to say

24  about this point.  So let me come back to you on that.

25          If the District Court has preempted the court and

1  has already determined that those funds are not property of

2  the Debtor, don't you need an injunction from the Court of

3  Appeals over the Florida District Court?

4          MR. AHRENS: No, Your Honor, and what I was going

5  to say is, he's starting to argue his case on Wednesday.

6          THE COURT: He is.  He is.

7          MR. AHRENS: And we briefed this, and we're ready

8  to argue and address all these questions on Wednesday, and

9  I just suggest we defer this until Wednesday because he's

10  made an eloquent opening argument for his case on

11  Wednesday.

12          THE COURT: Okay.  All right.

13          MR. AHRENS: And I think I have an answer as to

14  the cash collateral to your questions.  I've had three to

15  five minutes to think about it.

16          THE COURT: Okay.  Let Mr. Oetzell finish, though.

17          MR. OETZELL: Okay.  Your Honor, I believe -- I do

18  not know if the Debtor has informed you or not, but, you

19  know, the Debtor did bring a motion to stay in front of the

20  Eleventh Circuit, and that was rejected this morning.

21          THE COURT: A motion to stay what?

22          MR. OETZELL: A motion to stay the proceedings.

23          THE COURT: A motion to stay the contempt

24  proceedings or everything?

25          MR. OETZELL: In Florida.  It was the contempt

1  proceedings.

2          THE COURT: Only.

3          MR. OETZELL: I don't know if it was only, Your

4  Honor.

5          THE COURT: Have you read the decision of the

6  Eleventh Circuit?

7          MR. OETZELL: No.  I was just informed about it

8  this morning.  I don't know that it's actually --

9          THE COURT: Do you know anything about it?

10         MR. AHRENS: I don't, Your Honor.  I know -- yes,

11  of course, we did bring a motion to stay down there, and

12  that was in our papers, but I don't know the results yet.

13         THE COURT: Does somebody have a copy that could

14  be faxed to my chambers now, and then I could make copies

15  and give them to everybody?

16         MR. MORA: Your Honor, this is Michael Mora for

17  the FTC.

18         THE COURT: Yes, sir.

19         MR. MORA: Your Honor, my co-counsel, Ms. Guerard,

20  can address the Court on this matter.

21         THE COURT: I would rather get a written decision

22  if you have one and then --

23         MR. AHRENS: I don't think there is --

24         MS. GUERARD: Your Honor?

25         THE COURT: Yes.

1          MS. GUERARD: Can you hear me?

2          THE COURT: I hear you well.

3          MS. GUERARD: There is –- to the best of my

4     knowledge, there is no written decision.

5          THE COURT: What is there?

6          MS. GUERARD: There is a -- several lawyers,

7     including the appellate attorney at the FTC, received a

8     call from the deputy clerk of the Eleventh Circuit and to

9     the best of my understanding, the Eleventh Circuit is not

10    going to consider Integretal's emergency motion for a stay.

11         MR. SACKS: Your Honor, maybe I can address that,

12    to fill in what I understand to be the blanks here, from

13    what I understand from our counsel who was representing

14    Integretal in the Florida action.  What I understand

15    happened is that the clerk informed our counsel that they

16    believed that because a co-defendant on the September 14th

17    order had filed a motion for reconsideration of that order,

18    that therefore we could not seek a stay of the September

19    21st order which is the one that said no stay applied to the

20    payment order, to the requirement that we pay over the

21    money now.

22         We think that's a mistake.  We think they're

23    confused.  The September 14th orders and the September 21st

24    orders, we were going to file something to try and sort

25    that out to point out that even if the September 14th order

1  wasn't final because of a motion for reconsideration by a

2  different party, that it would still be appropriate to take

3  up our request for a stay with respect to our appeal of the

4  September 21st order.

5        THE COURT: I see.  So as far as you know, it's a

6  procedural decision that they've made, based on the pending

7  motion for reconsideration.

8        MR. SACKS: Correct.  On a different order, and so

9  that's why we think this is going to get sorted out, and

10 that's why I don't think anything formal has happened.  I

11 certainly haven't seen anything in writing that says the

12 motion for stay has been denied for any reason –- or for no

13 reason.

14       MR. OETZELL: But my point is, they are fighting

15 this on two fronts.  They're fighting this here, and

16 they're fighting this in Florida.  They're asking for the

17 same –- the same relief here.  They're asking for the same

18 relief in Florida.  It's being fought on two fronts.

19       I did also want to say, Your Honor, in respect of

20 this unblocking issue, that there's no factual reason why

21 this should be addressed now or should be addressed

22 Wednesday.  We've got a three-week cash collateral order.

23 They don't need the money for at least –- in respect to

24 their Exhibit C, it doesn't show that they need the money

25 until mid December.  They didn't need it last week.  They

1  don't need it for ten days, and they certainly don't need

2  it for three weeks.  So there's no factual issue and

3  there's no factual reason why we have to address it today.

4  There's no factual reason why we have to address it

5  Wednesday.  I think to the extent that it's addressed at

6  all, it should be addressed in the next cash collateral

7  order cycle.

8        MR. AHRENS: Your Honor, I would like to address

9  that comment.  First, we are not seeking the same relief in

10  this Bankruptcy Court that our client is seeking in the

11  Appellate Courts.  In the Appellate Court, they are simply

12  asking for a stay because the lower court was wrong.  In

13  this court, and only in this court, are we seeking a

14  bankruptcy decision that looks at the rights of other

15  creditors.  It looks at, under 541, whether it is the

16  property of the estate.  But I hesitate to get into that,

17  because once again, those are the issues teed up for

18  Wednesday and not for today.

19        THE COURT; Okay.  Well, just to tell you that I'm

20  struggling, and we're into Wednesday to some extent, pro or

21  con, here we are.  If there's a District Court order that

22  says you have to turn over these funds and that they're not

23  property of the estate and that they are property of the

24  receivers for the benefit of the receivers, are they

25  clients?  What are they called?

1          MR. OETZELL: They're defrauded consumers.

2          THE COURT: No, no, no.  That's too --

3          MR. OETZELL: Well, that's -- there's no

4    reflection on Integretal.

5          THE COURT: I know, but what are they -- even if

6    they weren't defrauded, what are they called?

7          MR. AHRENS: Former customers.

8          THE COURT: Is that what they are>

9          MR. OETZELL: Former customers works.

10          THE COURT: Well, okay.  So that they're the

11    property of these particular former customers.  Now, can

12    you pass the microphone to Mr. Fiero.

13          MR. FIERO: Your Honor, this is the race to the

14    courthouse problem.

15          THE COURT: But they got there though.  The

16    receiver got to the Florida courthouse, got an order that

17    says that these are not property of the estate -- these

18    funds are not property of the estate.  They belong to the

19    receivers, to the former customers who are now championed

20    by this receiver, and the question is, what jurisdiction do

21    I have to, quote, "free up" or not free up these funds?

22          MR. FIERO: Well, Your Honor, I don't think that

23    the District Court was trying to decide whether or not it

24    was property of the estate under Bankruptcy Code Section

25    541.

1          THE COURT: I don't either.  But here we have

2  this -- this transpired while the Debtor was in bankruptcy.

3  And here you are, in San Jose, with all due respect, rather

4  than in Florida, trying to explain to the District Court

5  what the status us.  Now that's -- I don't mean that by way

6  of criticism, but I have a problem with this, because I

7  have to now decide whether I can, quote, what it means to

8  free up funds that a Federal District Court has found

9  belong to somebody else.  I'm not asking you to decide, you

10  know, what your opinion is today.  I'm just telling you

11  that it seems to me you're -- you and -- as well as the

12  Debtor and to some extent, I guess, PaymentOne, are key

13  players in all of this, and I'm interested in your view.

14  Because what I don't want to do is I don't want to take

15  action which is clearly ultra vires, and I'm looking to

16  you, all of you at this table, to caution me if potentially

17  this Court is taking action which I don't have the

18  authority to do.

19          And I don't want to be in a position -- I mean

20  obviously you can't predict what an Appellate Court is

21  going to say about any action I take, but I'm looking to

22  this table to take care of this Court, and to make sure

23  that I have a fair and objective evaluation of whether I

24  should or shouldn't be deciding this, free up the 1.7

25  million dollar issue in the face of the current orders of

1  the District Court.

2          Now you and I may agree that the District Court
3  may not fully understand all the ramifications of a
4  bankruptcy and property of the estate under 541 and all of
5  that, but -- so does that give me any power to get in the
6  middle of this or am I stuck with honoring whatever the
7  District Court has done, and it's up to this table to go
8  clear that up to the extent that you can in the Eleventh
9  Circuit?  And you don't have to answer me now, Mr. Fiero,
10  but I want you to know that that question is going to be
11  addressed specifically to each person at that table, which,
12  you know, for the record, is Ahrens, Sacks -- tell me your
13  name again, sir?

14          MR. WARREN: Warren.

15          THE COURT: Mr. Warren, and Fiero.  I mean because
16  I don't want -- I don't want to do anything that's
17  inappropriate for a Bankruptcy Court under these
18  circumstances.

19          MR. FIERO: Your Honor, I understand the Court's
20  concern, and we will work to address that when the time
21  comes.  I do want the Court to know --

22          THE COURT: The time is going to come real soon.

23          MR. FIERO: Yes, Your Honor.  I do want the Court
24  to know that every creditor on my Committee has reserves --
25  that's a huge chunk of their claim is unpaid reserves, and

1  they sit today before this Court as unsecured creditors,

2  and why someone in Florida should have a better advantage,

3  is just -- it doesn't make any sense to any Committee

4  member.

5         THE COURT: Fine.  But that doesn't answer my

6  question.

7         MR. FIERO: I recognize that, Your Honor.

8         THE COURT: Okay.

9         MR. AHRENS: Your Honor, this, quote, unquote,

10 "fund" was established after these District Court orders.

11 It was established without --

12        THE COURT: Of course.  I understand.  It was

13 commingled funds.  You just took 1.7 million dollars out of

14 your general treasury and stuck it in a blocked account.  I

15 understand what you did.

16        MR. AHRENS: Thank you, Your Honor.  We have the

17 Court's suggestions.  We will fully argue this on

18 Wednesday, and we are prepared because we feel very

19 strongly.  I felt -- I said this for a long time, that I

20 did not want to have one creditor preferred over another,

21 and that's why we filed bankruptcy.

22        THE COURT: But doesn't give -- that's fine, Mr.

23 Ahrens, and I even agree with you mostly, but that doesn't

24 give me power as an Appellate Court over a District Court

25 in Florida, and so the question is -- and it would be

1  interesting to know what the U.S. Trustee's position is if

2  you have a position -- it would be interesting to know

3  whether I have the power to, quote, "free up funds" that

4  the District Court has held --

5          MR. AHRENS: No, Your Honor, I don't want to

6  interrupt, Your Honor.

7          THE COURT: Go ahead.  It's all right.

8          MR. AHRENS: The District Court did not hold that

9  specific assets, specific funds, were property of the

10  receivership.  This is like -- and this would be argued on

11  Wednesday.  This is a payment order, and we knew the judge

12  may come down with a payment order.  But on that day, when

13  that judge entered an order, there wasn't even a dollar

14  amount in that sentence.  It says pay over a certain

15  amount, but it didn't have the dollar amount.  And we're

16  going to argue a lot about this on Wednesday, and so that

17  is the same thing as an order to pay.  But it didn't say,

18  oh, you have this bank account that's set aside for this.

19  The funds at that time were at all times, were in the past

20  and continue to be commingled.  And so therefore there was

21  no order that you are holding a specific asset, like the

22  cases that are cited and we're going to argue.  Sometimes

23  it's stock; sometimes it's real property.  Those things are

24  traceable.  Those things are --

25          THE COURT: I understand, but am I the Court to

1  resolve this, or is the Eleventh Circuit the Court to

2  resolve this?

3           MR. AHRENS: Your Honor, you are the only Court

4  that can resolve this, and we're going to tell you more on

5  Wednesday why because you're the only Court to consider

6  rights of other creditors.  The court down in Florida

7  cannot, should not, and does not consider the rights of

8  anybody but --

9           THE COURT: The parties before it.

10           MR. AHRENS: That's right, Your Honor.

11           MR. WARREN: Your Honor, Stephen Warren, if I

12  might.  I agree wholeheartedly with what Mr. Ahrens said,

13  but I think it is important to distinguish.  This is not a

14  fund being administered by the District Court in Florida.

15  The 1.7 million dollars is only there because of a

16  stipulation with respect to cash collateral, period.  Full

17  stop.  So this Court is the one that has jurisdiction over

18  those proceeds.

19           MS. DIEMER: And, Your Honor, if I may address

20  this.  I apparently sat at the wrong table today.  I am a

21  secured creditors, and I am concerned the way this argument

22  is going, is what is happening to my security.  The reality

23  is this situation is no different than if a court, any

24  District Court here in the State of California, or a State

25  Court, had entered a writ of attachment.  This court in

1 Florida has no more power than a State Court or a District

2 Court here in California, in which an attachment had been

3 entered, shortly before a filing of a bankruptcy. You would

4 not be acting in a ultra vires manner should you not choose

5 to honor a writ of attachment in a local court, not any more

6 than you would for this court down there. These were not

7 the action that was taken by the Florida court as an

8 enforcement for monetary purposes and is affected by the

9 stay, just as it would in any court.

10          THE COURT: No, the court has already determined

11 that the stay doesn't apply, and nobody is suggesting that I

12 am supposed to review that, or I'm supposed to reconsider

13 that. Nobody is telling me that I ought to consider whether

14 there is or isn't an automatic stay. It's not an issue on

15 the table.

16          MS. DIEMER: I would like to know how an unsecured

17 creditor with a non-final judgment somehow has priority over

18 the security over the monies of a debtor that precedes,

19 predates, and somehow jumps ahead of me, a properly

20 perfected fully secured creditor.

21          THE COURT: All right. There are two answer to

22 that. One --

23          MR. SACKS: They don't.

24          THE COURT: Pardon me?

25          MR. SACKS: I'm sorry. They don't.

1          THE COURT: Well, one is, whether they do or not,

2    the only question I'm asking and you've answered it in the

3    first instance is, will I be acting ultra vires to act in

4    the face of the District Court orders to, quote, "free up"

5    the 1.7 million that we've blocked.  Now, arguably, as you

6    said, and I think it's true or I think Mr. Ahrens -- one of

7    you said it.  I don't remember -- no, Mr. Warren said it --

8    the 1.7 million didn't exist as a fund until bankruptcy and

9    until we work that out for the interim cash collateral.

10          MS. DIEMER: Right.

11          THE COURT: So that particular 1.7 million is just

12   a creation of the Bankruptcy Court and the stipulation.  It

13   otherwise didn't exist, that particular segregated fund.  So

14   if I unsegregate that fund, then I haven't done anything

15   that I haven't created.  But anyway, I think everybody

16   understands the concerns and, you know, Mr. Fiero's

17   arguments are essentially that the District Court is wrong.

18   The District Court is wrong in the face of a bankruptcy to

19   do what it did.  Fine.  Now what?  And that's the question.

20          MR. OETZELL: Your Honor, if you would indulge me

21   for just a second.

22          THE COURT: Not on the merits of this anymore.  I

23   really think that we ought to move on.

24          MR. OETZELL: I listened to two people, I believe

25   it was Mr. Fiero, and I've listened to Mr. Ahrens talk about

1 determining whether there we were just an unsecured

2 creditor, and Mr. Ahrens talking as Mr. Ahrens has talked

3 since the beginning of this thing about the effect of

4 commingling. Both those matters were brought up --

5          THE COURT: I know, were considered by the District

6 Court.

7          MR. OETZELL: Okay. Then if I could just -- if you

8 just indulge me, Your Honor --

9          THE COURT: I know that they were -- that has been

10 asserted to me many times. The question is -- I guess the

11 question is, so what, in terms of the law. And I mean no

12 disrespect to the District Court. So what? Where does that

13 get you in terms of my ability to free up the very funds

14 that we, by stipulation, segregated?

15          MR. OETZELL: Your Honor, you would be moving in

16 the clear face of a District Court order that specifically

17 says, and I quote:

18               "On Friday, September 14th, 2007, this court

19               issued its omnibus order in which it ruled that

20               the reserved funds are the property of the

21               receivership."

22 And I quote again:

23               "The court has already ruled that the reserved

24               funds are neither property of the bankruptcy

25               estate nor the property of Integretal."

1          THE COURT: I understand.

2          MR. OETZELL: And this is why I said last time that

3   Mr. Ahrens was making a pretty bold statement about the

4   status of those funds.

5          THE COURT: Okay.

6          MR. OETZELL: This is clear, as clear can be and

7   all you are being asked to do, Your Honor, is sit in review

8   of the District Court order which Your Honor eschewed last

9   week.

10         THE COURT: I understand.  You've basically just

11  expressed the very concern that I expressed to them.  You

12  haven't said anything --

13         MR. MORA: Your Honor, Michael Mora for the FTC.

14  May I be heard for one moment, please?

15         THE COURT: Yes, sir.

16         MR. MORA: And I'm not going to argue today, Your

17  Honor.  I want to suggest something that maybe will help us

18  sharpen the focus of these issues for Wednesday.  As we see

19  it, there's really two dimensions to the answer to Your

20  Honor's question.  One is jurisdiction, and the other is

21  power.  Those are two separate things, and, Your Honor,

22  everybody is aware --

23         THE COURT: I agree.  I agree.

24         MR. MORA: And everybody is aware of our position

25  on it, and I just wanted to state that.

1       THE COURT: Thank you, sir.  They should both be

2  addressed, jurisdiction and power.  The ultra vires question

3  goes to power.

4       MR. AHRENS: We will, Your Honor.  I'm not going to

5  reply to any of the arguments.

6       THE COURT: Right.  I agree.  I agree.

7       MR. AHRENS:  I think we should put an end to --

8       THE COURT: I think we've articulated it, but, you

9  know, even though you're saying, well, we ought to put

10  everything off to Wednesday, my own impression is, it's

11  better to know what we're all thinking about, at least know

12  what the Court's concerns are now, rather than telling you

13  Wednesday.  So you've got some of the concerns that I have.

14       MR. AHRENS: I understand.

15       THE COURT:  And I'm not saying that I don't think

16  you're right; I'm just -- I have these concerns.

17       MR. AHRENS: This table appreciates that, so that

18  we can prepare better for Wednesday.

19       THE COURT: Thank you.

20       MR. AHRENS: Your Honor, to answer your first

21  question, what I opened a book and I have what I thought it

22  was, and it states under Rule 7001.2, that any proceeding to

23  determine the validity or any interest in property has to be

24  by way of adversary complaint.  What we are talking about is

25  two parties who we vehemently feel have no interest in our

1   assets because we've already established through lots of

2   pleadings that the way this business operates is to assign

3   the accounts receivable to the Debtor.  The Debtor then

4   assigns them and collects.

5        There is a question of fact that was posed by

6   Personal Voice as to theirs, and we think that we are freely

7   using our own money that has been commingled.  It's not

8   their money.  But the bottom line is that they did assign

9   the accounts receivable to us.  Now if they want to bring on

10  a hearing -- I think they said they're going to be bringing

11  on a hearing –- then they'll get that determined.  And

12  they're not going to lose anything in the interim, Your

13  Honor, because what they asked for was $40,000 a week.  They

14  said they're going to be filing something next week.  We

15  would agree to an expedited hearing on that to determine

16  that issue.  We'll put in our declarations.  They put in

17  theirs.  If they want witnesses, we'd agree to it.

18       But they're not being prejudiced, Your Honor, at

19  $40,000 a week.  There's plenty of cash for $40,000 a week.

20  But we don't think we should set up any more segregated

21  accounts because we don't think -- now that we have a

22  Creditors' Committee that supports us on this issue --

23  anybody is entitled to any more segregations.

24       With respect to Public Communications, Your Honor,

25  that's $14,000 a week.  They too, if they want to join in

1   the adversary complaint, they have I think different issues,

2   but, you know, they're free to do so.  And they have a

3   remedy under Rule 7001.

4          THE COURT: Yeah.  Joining in an adversary may or

5   may not be useful if you've got possibility of reaching

6   independent settlements, but that's fine.

7          MR. AHRENS: Thank you, Your Honor.  And if you

8   have any other questions, we have a form of order on the use

9   of cash collateral.  I would like to call the Court's

10  attention to at least two changes in it.

11         THE COURT: Yes, please.  But, Mr. Ahrens, here's

12  the question, I guess, that you haven't answered.  You've

13  finessed my question.

14         MR. FIERO: I hope it was intentional.

15         THE COURT: You judge for yourself.  In the face of

16  an argument under 541, property of the estate, I can say to

17  them, that's nice.  But you have to do that by way of

18  adversary.  And their response can be, yeah, but you can't

19  use money that we've alleged is not property of the estate

20  in the meantime.  And so I said to you, is it sufficient --

21  I'll change it slightly -- is it sufficient for me to just

22  say, file an adversary; you're not prejudiced, or do I have

23  to make some kind of finding that there is or isn't property

24  of the estate or that it is or isn't likely property of the

25  estate, or is it sufficient for me to just allow you to use

1    property for cash collateral purposes that they claim is not

2    property of the estate, merely with a statement file an

3    adversary.  And until you prevail, they can use it, even in

4    the face of your allegation.  So that's the question, and

5    that's the question I asked earlier.

6          MR. AHRENS: I think since -- well, first, I think

7    cash is fungible.  I mean it's all in the same bank account,

8    and so we're using the cash we have and we have cash to last

9    us for the next three weeks and so I think it is -- I don't

10   think you have to make a finding, but if you do have to make

11   a finding, I think we've made more than an adequate showing.

12   Without -- they tried to get a perfected security interest.

13   They filed a UCC-1, and it was imperfect.  It lapsed --

14         THE COURT: We're not talking about a security

15   interest.  They're saying it's not property of the estate

16   because of the way you've set up your business.  I

17   understand your arguments that they're unsecured at best.

18         MR. AHRENS: But what I'm saying is -- I'm going to

19   the merits -- I said I think you have plenty of facts to

20   make a finding of -- I don't think you have to -- but I

21   think you have plenty of facts to make a finding that it is

22   our assets and not their assets, and the reason is, is

23   because they made a UCC-1 filing, and in some documents you

24   say this is a protective filing, and they didn't say that.

25   They could have said this is a protective filing.  It's

1  really our asset.  But they didn't say that.  They let it

2  lapse.

3         THE COURT: Who is "they"?

4         MR. AHRENS: That is Personal Voice, Your Honor,

5  what we're talking about.

6         THE COURT: Well, what about the other two?

7         MR. AHRENS: The other two haven't raised these

8  same issues as to it's their asset.  It's my recollection

9  this is a Personal Voice issue that they attached their

10 contract to their declaration, and they said, look at this

11 contract.  My client read it and said I read that to be my

12 asset.  They're saying I read that to be their asset.  So

13 I'm only addressing Personal Voice in this one, Your Honor.

14        But I think you have more than enough facts today

15 to enter a finding that's likely we will prevail on the

16 merits because they tried to get a security interest.  You

17 don't try to get a security interest in your own property.

18 Like when there's a leasehold, sometimes you have a personal

19 property lease.  You do a protective filing.  They didn't do

20 a protective filing.  But that being said, this is a cash

21 collateral use.  We will not use $40,000 -- for the next

22 three weeks, if they want to, they have more than adequate

23 time to come to this court and seek the declaration that

24 they said they're going to seek.  So I think you don't need

25 a finding.  I think if you were inclined to disagree with

1 me, that you have more than sufficient facts to make that
2 finding.
3         THE COURT: Mr. Fiero, do you agree with both of
4 those?
5         MR. FIERO: Yes, Your Honor.  I think that the
6 question of ownership in this instance can be resolved by
7 the concept of adequate protection.  It's no different from,
8 I put something fungible in your warehouse, and it's a
9 bailment.  As long as you know that something just like it
10 is going to be there afterward, there's no risk to you
11 whatsoever.  What we're talking about here at the very most
12 is a bailment of cash.
13         THE COURT: Does anybody on the phone wish to say
14 anything before I take a brief recess?  No.  Okay, I'm
15 going to take a recess and then I'll come back, and I'll let
16 you know where we are in terms of issuing a decision on cash
17 collateral.  Are we finished with papers for the P.I.?  Are
18 we done?  Am I going to get any last-minute stuff?  No.
19 Everybody is saying no.
20         MS. DIEMER: Your Honor, in the sense that you've
21 just asked whether or not -- you've just sort of asked the
22 creditors, the secured creditors like myself for some
23 information about whether or not it would be an ultra vires
24 act.  We may want to file something addressing that issue.
25 We had not thought we needed to chime in, until the Court

1  addressed those questions.

2        THE COURT: Well, I assume they're going to be

3  addressed orally at the hearing.

4        MS. DIEMER: In that case, we'd be happy to do

5  that.

6        THE COURT: So I just -- I guess probably more

7  paper at this point unless we're going to put off the

8  hearing would be problematic.

9        MS. DIEMER: No, I'd be happy to address them

10  orally; it would be easier for me.

11        THE COURT: Okay.

12        MR. OETZELL: Your Honor?

13        THE COURT:  Did you want to say something?

14        MR. OETZELL: Yes, if I might, Your Honor.  Excuse

15  me for stating the obvious, but obviously we are here to

16  request that the subject funds be excluded from any cash

17  collateral order, clear and solid --

18        THE COURT: But my understanding is that Mr. Ahrens

19  has agreed that the subject funds are excluded until

20  Wednesday.

21        MR. AHRENS: That is correct.

22        THE COURT: So that you have a two-day agreement,

23  and then all -- everything is open as of Wednesday.

24        MR. OETZELL: Well, we have a three-week cash

25  collateral order that Your Honor is considering signing.  I

1  believe that those funds should be excluded for the whole

2  three weeks.

3          THE COURT: I'm not going to do that.  Unless you

4  reach some kind of agreement, I'm not going to do that.

5  They're on the table just like everything else starting

6  Wednesday.  They're not today, but starting Wednesday, it's

7  all open.  And you had a way of stopping that, but you

8  declined.

9          MR. OETZELL: I understand, Your Honor.  I would

10 also object that we have had inadequate notice of a motion

11 to unblock this account.

12         THE COURT: What does that mean?

13         MR. OETZELL: It means that there was no -- that

14 the account was supposed to be unblocked only upon --

15         THE COURT: The account was blocked for three weeks

16 by mutual agreement only, on a settlement.

17         MR. OETZELL: Unblocked on motion, Your Honor.

18 There was no formal motion brought before you.  There was no

19 motion to shorten time.  It's --

20         THE COURT: Wait a second.  Okay.  I should let you

21 finish.  Just finish.

22         MR. OETZELL: All that happened was on Friday, and

23 this is after we had to reply to the cash collateral, this

24 is before they got their pleadings in on the cash

25 collateral, they made it obvious on Friday that they were

1  going to go ahead and ask the Court to unblock it on an oral

2  motion.

3          THE COURT: But, sir, the blocking only occurred as

4  part of a quid pro quo agreement for three weeks.  It wasn't

5  that we agree to block these indefinitely.  The agreement

6  was we agree to block these for three weeks in return for

7  your agreement to do something for three weeks.  It was a

8  contract.  It was a settlement.  It was a three-week deal.

9  And so at the end of the three weeks, everybody is back to

10 square one.  And you knew that your deal was only good for

11 three weeks, and they knew that their deal was only good for

12 three weeks.  You had no blocked permanent account.  You had

13 a three-week deal, and that was the Court's intention; that

14 was the Court's understanding, and I'd given you a way to

15 have more time if you want it, and you've declined it.  But

16 my understanding of what has occurred is that you made a

17 three-week deal.  They've honored their three-week deal.

18 You've honored the three-week deal.  And now we're back to

19 square one, and that's where we are.  There's no agreement

20 to block funds more than those three weeks.

21          MR. OETZELL: Your Honor, that's not what it reads.

22 The agreement reads that the funds are blocked until further

23 order of the court.  An order of the court would presuppose

24 a motion, and this is a highly improper motion, Your Honor,

25 absolutely no notice whatsoever.

1    THE COURT: I told you how to stop it, and you've

2    chosen not to do it.  We're going forward on Wednesday.

3    MR. OETZELL: Okay.  For the record, Your Honor, we

4    would object to that motion --

5    THE COURT: I understand.  I respectfully

6    understand, but I --

7    MR. OETZELL: -- on the grounds that it does not

8    comply with the Local Rules, and it does not comply with the

9    rules --

10    THE COURT: The deal was a blocked account for

11    three weeks, and that's what you got, and that's all you

12    bargained for.

13    MR. OETZELL: Your Honor, respectfully, that's not

14    what the order says, but --

15    THE COURT: That's the way the Court interprets its

16    own order.

17    MR. OETZELL: I understand, Your Honor.

18    THE COURT: Okay.  We're in recess.

19    MR. AHRENS: Thank you, Your Honor.

20    THE CLERK: Please rise.

21    (Whereupon, a recess is taken at 4:08 p.m., and the

22    court is reconvened at 4:23 p.m.)

23    THE COURT: Ladies and gentlemen -- you can stay

24    where you are -- relax.  Sit down.  Do whatever you need to

25    do.

1    The Court's going to grant the motion for use of

2  cash collateral over the objections.  But given the lateness

3  of the hour, the Court would prefer to issue its oral

4  findings of fact and conclusions of law tomorrow at 2:00

5  o'clock on the record, and so unless that's going to make

6  terrible problems for the Debtor, that's what I propose to

7  do.  Is that okay?

8    MR. AHRENS: Could I check with my client for one

9  minute?

10    THE COURT: Yes.

11    (Pause.)

12    MR. AHRENS: Your Honor, that's fine.

13    THE COURT: Okay.  Anybody who wants to appear by

14  phone should make your arrangements.  Nobody has to come.

15  I'm just going to read the findings -- I'm not going to have

16  argument.  I'm just going to read the findings of fact and

17  conclusions of law into the record and then hang up.  So --

18    (Laughter.)

19    THE COURT: And that's it.  And so nobody has to

20  feel like -- if you want to order a copy of the CD and not

21  appear, you can do that.  Whatever you want to do.  I'll

22  look forward to having some of you on the phone.  If -- go

23  off the record, please?

24    (Off the record.)

25    MR. AHRENS: The only changes we have is on page 2.

1 We changed the definition of the budget to "that certain

2 budget attached to the Weber declaration," to that certain

3 budget attached as Exhibit B, because we want to make clear

4 it's the Debtor's budget and not the other budget that we

5 had attached.

6        And then as to service, Federal Express is getting

7 quite expensive, so we are proposing the service, Your

8 Honor, be by e-mail to those that appeared, and I think

9 virtually everybody gets our e-mail, and U.S. Mail, because

10 Federal Express is getting awfully expensive.  And then the

11 last change is --

12        THE COURT: If anybody wants to get e-mail service

13 who's not on Mr. Ahrens' list, could you please fax Mr.

14 Ahrens your e-mail as soon as possible.

15        MR. AHRENS: Yes.  And then the last change is we

16 just changed the name of the person from the Office of the

17 U.S. Trustee with John Wesolowski because he's substituting

18 in.  That's it, Your Honor.

19        THE COURT: That's fine.

20        MS. DIEMER: Mr. Ahrens?  POL?  The POL monies?

21        THE COURT: Are you not on e-mail?

22        MS. DIEMER: I am on e-mail, but there was a change

23 to the order I believe, that the budget would include the

24 POL payment.

25        MR. AHRENS: Oh yes.  That's the fourth one I've

1 already said it. It's the POL --

2          THE COURT: Yes, the payment.

3          MR. AHRENS: Yes.

4          MS. DIEMER: Right.

5          THE COURT: Very good. Thank you ladies and

6 gentlemen. Court is --

7          MR. PARDO: Your Honor?

8          THE COURT: Yes.

9          MR. PARDO: Excuse me, John Pardo. One question.

10 When is the continued hearing on cash collateral?

11          THE COURT: Oh, we haven't done that. We need to

12 do that.

13     (Laughter.)

14          MR. AHRENS: Your Honor, I have talked to a number

15 of parties. Because of various schedules, the best day

16 seems to be, if the Court has it, November 2.

17          THE COURT: Okay. We'll do it. November 2. I

18 know, we have a trial. November 2 -- how much time do you

19 think we're going to need?

20          MR. AHRENS: Your Honor, it's generally taken three

21 hours.

22          THE COURT: Okay. How's 1:00 o'clock?

23          MR. AHRENS: That's fine, Your Honor. Thank you.

24          THE COURT: Okay. November 2, 1:00 o'clock.

25          MR. SACKS: Do you want us to leave you written

1 | copies of the order or --

2 | THE COURT: Sure.

3 | MR. SACKS: -- just do it by uploading it.

4 | THE COURT: Well, you should upload it, if Tanya

5 | wants you to upload it. What's the easiest for you, Tanya?

6 | Whatever is easiest for you.

7 | THE CLERK: There's going to be no more changes; is

8 | that right, so I'll take it.

9 | THE COURT: Okay. Yeah, that's fine.

10 | MR. AHRENS: Since we won't be talking much

11 | tomorrow and only listening, we probably ought to talk about

12 | the other dates for the order. On paragraph 31, the Debtor

13 | shall on or before a certain date serve a copy of this

14 | order -- we could probably do that by the end of this

15 | week -- and such order shall state that any party in

16 | interest objecting to the approval of the motion on a final

17 | basis shall file it by a certain time.

18 | MR. SACKS: Mr. Ahrens is looking at paragraph 31

19 | where there are blanks to be inserted in the order.

20 | THE COURT: I understand. I understand. So I

21 | should give him back this order because it's going to have

22 | the same blanks, right?

23 | MR. AHRENS: Yes, Your Honor.

24 | THE COURT: Tanya, can you give him back this

25 | order, please?

1          MR. AHRENS: I have one right here.

2          THE COURT: Right.  But I want you to insert it on

3    mine too.

4          MR. AHRENS: I would think that any objections on a

5    final basis to the hearing should be filed by the 29th of

6    October.

7          THE COURT: No, the 26th.

8          MR. AHRENS: The 26th, Your Honor, that's fine.

9          THE COURT: And then your response is going to have

10   to come in very soon by the 30th.

11         MR. AHRENS: Yes, that's fine, Your Honor.  The

12   30th is plenty of time.

13         THE COURT: All right.

14         MR. AHRENS: And I think that's the only dates we

15   need to --

16         THE COURT: That's fine.

17         MR. AHRENS: Thank you, Your Honor.  You know,

18   they're uploading and so rather than the 26th, somebody

19   might want to work over the weekend, so I'll say the 28th,

20   but as long as we have it first thing Monday morning, that's

21   the key.  So if they want to upload it by the 28th, that's

22   okay, but they can't file it -- if they're not e-filers, it

23   has to be filed by the 26th.  But if you're an e-filer, you

24   can use -- you can upload it to the court.

25         MR. SACKS: That's the objection deadline?

1          THE COURT: Right.

2          MR. SACKS: Okay.

3          THE COURT: I want to have it Monday morning, the

4  objection.

5          MR. SACKS: I'm going to cross out "file" then and

6  write "e-filed," or "electronically filed."

7          THE COURT: Electronically filed by the close of

8  business on the 28th or regularly filed, paper filed, by the

9  26th.  Thank you.

10          MR. AHRENS: Thank you, Your Honor.

11          THE COURT: Make it on my copy so when I sign it,

12  I'm signing the right thing.

13          MR. SACKS: That's what I'm trying to do.

14          THE COURT: Thank you.  Court is adjourned.

15          ALL COUNSEL: Thank you, Your Honor.

16      (Whereupon, the proceedings are concluded at 4:29 p.m.)

17

18

19

20

21

22

23

24

25

1

2

3

4                        CERTIFICATE OF TRANSCRIBER

5

6              I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10   DATED: October 21, 2007

11

12                           By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25