1      UNITED STATES BANKRUPTCY COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      (SAN JOSE DIVISION)

4

5  In re:

6  THE BILLING RESOURCE,              Case No. 07-52890-ASW

7                                     Chapter 11

8                                     San Jose, California
                                      March 7, 2008
9                                     1:15 p.m.
        Debtor.
10  _____/

11  THE BILLING RESOURCE, dba
    INTEGRETEL, a California
12  corporation,

13          Plaintiff,

14      v.                             A.P. No. 07-5156

15  DAVID R. CHASE, et al.,

16          Defendants.
    _____/

17

18              TRANSCRIPT OF PROCEEDINGS
           a) NOTICE OF STATUS CONFERENCE IN CHAPTER 11
19           b) HEARING ON APPROVAL OF SECOND AMENDED
              DISCLOSURE STATEMENT FILED BY DEBTOR
20           c) OBJECTION OF STATE OF WASHINGTON
              d) RESPONSE BY PAYMENTONE CORPORATION
21      e) OBJECTION TO FIRST AMENDED DISCLOSURE STATEMENT
                 BY FEDERAL TRADE COMMISSION
22      f) OBJECTION BY THE LOUISIANA DEPARTMENT OF REVENUE
          g) INTERIM HEARING RE EMERGENCY MOTION FOR USE OF
23         CASH COLLATERAL AND GRANTING REPLACEMENT LIENS
            AND APPROVING FIRST AMENDED STIPULATION WITH
24    PAYMENTONE CORPORATION REGARDING USE OF CASH COLLATERAL
              AND ADEQUATE PROTECTION BY DEBTOR
25        h) LIMITED OBJECTIONS BY FEDERAL RECEIVER

```
 1              i) RENEWED OBJECTION BY POL, INC.
       j) MOTION FOR ORDER EXTENDING THE PERIOD DURING WHICH
 2         THE DEBTOR HAS THE EXCLUSIVE RIGHT TO FILE A
       PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES FOR AN
 3          ADDITIONAL SIXTY DAYS THROUGH AND INCLUDING
                     MAY 13, 2008 BY DEBTOR
 4      k) MOTION FOR ORDER APPROVING SETTLEMENT OF CLAIM BY
            COMMISSIONER OF TAXATION AND FINANCE OF THE
 5                 STATE OF NEW YORK BY DEBTOR

 6

 7               TRANSCRIPT OF PROCEEDINGS
                    RE A.P. NO. 07-5156
 8         a) MOTION FOR ORDER TO SHOW CAUSE REGARDING
           PRELIMINARY INJUNCTION AND DECLARATORY RELIEF
 9    b) OPPOSITION BY DEFENDANT, FEDERAL TRADE COMMISSION
       c) OPPOSITION BY DAVID R. CHASE, FEDERAL RECEIVER
10          OF ACCESS ONE COMMUNICATIONS, INC. AND
                   NETWORK ONE SERVICES, INC.
11     d) MOTION FOR EXTENSION OF PRELIMINARY INJUNCTION
       AGAINST PROSECUTION OF FLORIDA ACTION BY PLAINTIFF
12     e) OPPOSITION BY DAVID R. CHASE, FEDERAL RECEIVER
       f) OPPOSITION BY DEFENDANT, FEDERAL TRADE COMMISSION

13

14         BEFORE THE HONORABLE ARTHUR WEISSBRODT
               UNITED STATES BANKRUPTCY JUDGE

15

16  APPEARANCES:

17

18  For the Debtor:          SHEPPARD, MULLIN, RICHTER and
                             HAMPTON
                             BY:  STEVEN SACKS, ESQ.
19                           Four Embarcadero Center, 17th Floor
                             San Francisco, California 94111
20

21

22  For the Federal          DANNING, GILL, DIAMOND &
    Receiver:                KOLLITZ, LLP
                             BY: WALTER OETZELL, ESQ.
23                           2029 Century Park East, 3rd Floor
                             Los Angeles, California 90067
24                           (APPEARING TELEPHONICALLY)

25
```

```
 1  APPEARANCES (CONTINUED):

 2
    For PaymentOne:          O'MELVENY & MYERS, LLP
 3                           BY: STEPHEN H. WARREN, ESQ.
                                       -and-
 4                               VICTORIA NEWMARK, ESQ.
                             400 South Hope Street
 5                           Los Angeles, California 90071
                             (APPEARING TELEPHONICALLY)
 6

 7
    For the Committee:       PACHULSKI, STANG, ZIEHL, JONES
 8                           BY: JOHN D. FIERO, ESQ.
                             150 California Street, 15ᵗʰ Floor
 9                           San Francisco, California 94111

10

11  For POL, Inc.:           DIEMER, WHITMAN and CARDOSI
                             BY: KATHRYN S. DIEMER, ESQ.
12                           75 East Santa Clara Street
                             San Jose, California 95113
13

14
    For the U.S. Trustee:    OFFICE OF THE U.S. TRUSTEE
15                           BY: JOHN S. WESOLOWSKI, ESQ.
                             280 South First Street #268
16                           San Jose, California 95113

17

18  For the Federal Trade    UNITED STATES FEDERAL TRADE
    Commission:              COMMISSION
19                           OFFICE OF THE GENERAL COUNSEL
                             BY: JOHN ANDREW SINGER, ESQ.
20                               MICHAEL MORA, ESQ.
                                 COLLOT GUERARD, ESQ.
21                           600 Pennsylvania Avenue, NW
                             Washington, DC 20580
22
                             (Mr. Singer and Ms. Guerard
23                           appearing telephonically)

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   For United Online:        BUCHALTER NEMER
                               BY: JEFFREY K. GARFINKLE, Esq.
 4                             18400 Von Karman Ave. #800
                               Irvine, California 92612
 5
                               (APPEARING TELEPHONICALLY)
 6

 7   For Personal Voice:       LAW OFFICES OF THOMAS C. LITTLE
                               BY: THOMAS C. LITTLE, ESQ.
 8                             3234 N.E. Coachman Road #A
                               Clearwater, Florida 33765
 9
                               (APPEARING TELEPHONICALLY)
10

11
     For the Louisiana         LOUISIANA DEPARTMENT OF REVENUE
12   Dept. Of Revenue:         BY: FLORENCE BONACCORSO-SAENZ
                               617 North 3$^{rd}$ Street
13                             Baton Rouge, Louisiana 70802

14

15
     For PCS:                  LINER, YANKELEVITZ, SUNSHINE
16                             BY: ENID COLSON, ESQ.
                               1100 Glendon Ave., 14$^{th}$ Floor
17                             Los Angeles, California 90024

18                             (APPEARING TELEPHONICALLY)

19
     Court Recorder:           ERICA RENDLER
20                             UNITED STATES BANKRUPTCY COURT
                               280 South First Street
21                             San Jose, California 95113

22
     Transcription Service:    Jo McCall
23                             Electronic Court
                               Recording/Transcribing
24                             2868 E. Clifton Court
                               Gilbert, Arizona 85297
25                             Telephone: (480-361-3790
```

1       P R O C E E D I N G S

2   March 7, 2008                    1:15 p.m.

3                   ---oOo—--

4           THE CLERK: Please rise.  This is the United

5   States Bankruptcy Court for the Northern District of

6   California.  The Court is now in session.

7           THE COURT: Good afternoon, ladies and gentlemen.

8   Please be seated.  This is the <u>Billing Resource.</u>  I'll

9   first take appearances of the lawyers in the courtroom.

10          MR. SACKS: Good afternoon, Your Honor, Steven

11  Sacks of Sheppard, Mullin, for the Debtor.

12          THE COURT: Good afternoon, Mr. Sacks.

13          MS. DIEMER: Good afternoon, Your Honor, Kathryn

14  Diemer on behalf of POL and also on behalf of the Voice

15  Mail Enhanced Long Distance, et cetera.

16          THE COURT: Et cetera.

17          MR. WESOLOWSKI: Good afternoon, Your Honor, John

18  Wesolowski for the U.S. Trustee.

19          THE COURT: Good afternoon.

20          MR. MORA: Good afternoon, Your Honor, Michael

21  Mora for the Federal Trade Commission.

22          MR. OETZELL: Good afternoon, Your Honor, Walter

23  Oetzell of Danning, Gill, Diamond and Kollitz on behalf of

24  the Federal Receiver.

25          MR. FIERO: John Fiero for the Committee, Your

1 | Honor.

2 | THE COURT: Good afternoon. John Singer?

3 | MR. SINGER: Yes, Your Honor.

4 | THE COURT: May I have your appearance?

5 | MR. SINGER: I'm just listening in, but I'm here

6 | for the Federal Trade Commission, Your Honor.

7 | THE COURT: Right.

8 | MR. SINGER: Mr. Mora is taking the --

9 | THE COURT: I understand, and Mr. Mora is in the

10 | courtroom right in front of me, but I have a phone list.

11 | MR. SINGER: Okay.

12 | THE COURT: So I go down the phone list and people

13 | enter their appearances. It's standard operating

14 | procedure.

15 | MR. SINGER: Certainly, Your Honor, I'm sorry.

16 | THE COURT: Mr. Garfinkle?

17 | MR. GARFINKLE: Yes, Your Honor, Jeff Garfinkle of

18 | Buchalter Nemer on behalf of United Online. I have a

19 | protest going on outside my office window, so I'm going to

20 | put the Court on mute.

21 | THE COURT: Okay. Victoria Newmark?

22 | MS. NEWMARK: Victoria Newmark, O'Melveny & Myers

23 | appearing on behalf of PaymentOne.

24 | THE COURT: Steve Warren?

25 | THE OPERATOR: This is the court call operator. I

1   was not able to get Mr. Warren on the line.

2          MS. NEWMARK: Mr. Warren will not be on.  He has

3   another meeting.  If he is able to attend, he will be

4   joining me on my line.  This is Victoria Newmark.

5          THE COURT: That will be fine.  Collot Guerard?

6          MS. GUERARD: Gollot Guerard, Your Honor, for the

7   Federal Trade Commission.

8          THE COURT: Florence Bonaccorso-Saenz?

9          MS. BONACCORSO-SAENZ: Florence Bonaccorso-Saenz,

10  Your Honor, on behalf of the Louisiana Department of

11  Revenue.

12         THE COURT: Thomas Little?

13         THE OPERATOR: This is the operator again, he's

14  mentioned that he will be dialing in.

15         THE COURT: Enid Colson:

16         MS. COLSON: Good afternoon, Your Honor, Enid

17  Colson appearing on behalf of Public Communications

18  Services, Inc.

19         THE COURT: Is there anybody else on the phone?

20     (No response.)

21         Okay.  Mr. Sacks?

22         MR. SACKS: Your Honor, we have a number of

23  matters on calendar.  I can start at the top with the

24  injunction matter in the adversary or go anywhere you wish.

25         THE COURT: Whatever you like.

1          MR. SACKS: I'm happy to start with --

2          THE COURT: It may make sense for you to give me a

3   little update on what's going on.

4          MR. SACKS: Okay.

5          THE COURT: And then we'll go to the injunction.

6          MR. SACKS: I'm happy to do that, Your Honor.  We

7   asked the Court to continue the hearing on the Disclosure

8   Statement -- further hearing on the Disclosure Statement --

9   that was set for today, and that's because we do not have a

10  definitive agreement at this time with a stalking horse

11  bidder as we intend to obtain.  However, our opinion is

12  that the prospects for getting one are very good.  We've

13  got some term sheets and we appear to be in prospect of

14  getting more.  We've talked to the Committee about the

15  current status; we've kept them informed, and so I expect

16  within the next week or two, we will be coming back and

17  proceeding with either an asset sale or a sale connected to

18  a reorganization, as we've currently -- in basically the

19  fashion we've currently proposed it.

20          THE COURT: Counsel?

21          MR. FIERO: Your Honor, John Fiero for the

22  Committee.  I would echo Mr. Sacks' comments, but the truth

23  is that while we have been hopeful many times that we

24  almost had a stalking horse in hand, the truth is today

25  we're in a better position than we ever were before, and

1   the Committee is encouraged and is in full agreement with

2   the Debtor that the approach of putting off the Disclosure

3   Statement hearing and continuing the negotiations is a good

4   idea.

5           THE COURT: Very good.

6           MR. SACKS: Let me just add one thing, which is

7   that if we had to have one today or next week, we could

8   pick one and go that way, but the feeling on the Debtor's

9   side and I think the Committee's side as well is that we

10  are benefitting from this process at this point rather than

11  jumping on a horse and riding it immediately.

12          THE COURT: Sure.  I understand.  Okay.  So let's

13  turn to the injunction.  There was something in the papers

14  that I wanted to ask Mr. Mora about.  Is there anything --

15  what's the status of your list of telephone numbers and

16  addresses of the consumers that are involved because my

17  understanding is that you're concerned that the people may

18  move or you may lose their telephone numbers.  What exactly

19  is that?  Do you have a list and is there some way you'd

20  want to update it by writing them and saying, keep us

21  informed of your address or your phone number?  Because I

22  could carve that out of an injunction order if that would

23  really help you.  I just -- I didn't really understand what

24  you have and what you wanted.

25          MR. MORA: All right.  Your Honor, Ms. Collot is

1  on the line and could speak to the specifics, but in

2  general, I can tell you that the FTC knows from experience,

3  and I'm sure the Debtor probably has experience with this

4  too, that as a general matter, people's phone numbers

5  change, you know, every six to twelve months.

6          THE COURT: Right. But do you now have a list?

7  Do you have a list of people that currently exists that

8  could be theoretically updated if you wanted to update it?

9          MS. GUERARD: Your Honor?

10          THE COURT: Yes, Ms. Guerard.

11          MS. GUERARD: This is Collot Guerard. We do not

12  have a list with consumers' names and address. We do have

13  a record, a telephone record, which shows how much was paid

14  by a particular telephone number. But we do not have the

15  names and addresses associated with those telephone

16  numbers.

17          THE COURT: Okay. And so down the road, if you

18  were to have a pot of money and that list of telephone

19  numbers, what would you do?

20          MS. GUERARD: We would -- our plan had been, Your

21  Honor, to effect redress through the telephone company, so

22  what a consumer had paid or was charged to the consumer and

23  the consumer had paid would be returned to that consumer

24  through that consumer's telephone company.

25          THE COURT: I see. Okay. Do you wish to make any

1   additional points at this point, Mr Sacks, other than

2   what's in your papers?

3           MR. SACKS: No, Your Honor.

4           THE COURT: And, Mr. Mora, do you wish to make any

5   additional points or to emphasize some point that you think

6   is important?

7           MR. MORA: Yes, Your Honor, I would.

8           THE COURT: Go ahead.

9           MR. MORA: Thank you.  Your Honor, what I'd like

10  to address is the reply brief that was filed.  Bear with me

11  one moment.

12          THE COURT: I could move to POL.  I'm sure she

13  wants to say something too and then come back to you if

14  that would be helpful.

15          MR. MORA: No, I can take care of this right now.

16          THE COURT: Go ahead.  Excuse me.  Is there

17  somebody at counsel table or close to counsel table who has

18  a PDA on, because that's what's producing this static, even

19  a phone that's on might produce -- if you have a colleague

20  in the back, you could give it to somebody, but that's

21  what's producing this static here.

22          And could you give Ms. Diemer some water?

23          THE DEPUTY: Anyone on the phone too.

24          THE COURT: Anybody on the phone who's sitting on

25  the phone with a PDA, my deputy informs me can produce the

1  static we're getting.  It seems to have stopped for now,

2  but please make sure your PDA's are off.

3       MR. MORA: Well, Your Honor, the only thing new

4  that Integretel really presented in its reply is really

5  evidence that doesn't really substantiate their claim, but

6  they presented it for the first time in their reply, the

7  declaration of Mr. Neil Goldfarb, and this is an injunctive

8  proceeding.  The burden was on them to come forward in the

9  first instance in their opening papers with evidence of

10  that nature, and it wasn't produced until two days ago with

11  the reply brief.  We think it would be inappropriate to

12  rely on it at all, but we don't think it substantiates

13  irreparable harm on their part, in any event.

14       Also, Your Honor, I think what we've learned

15  today just underscores the lack of irreparable harm here

16  because here we are six months into the case, and although

17  the Debtor has been talking for months now about the

18  possibility of reorganization, we're still here with no

19  signed bid in hand and even by their own admission, it

20  looks more likely that this case will end in an asset sale

21  in a liquidation, and their whole case for asking the Court

22  for an injunction is built around the possibility or

23  likelihood of a reorganization.

24       And in the record before the Court, based on

25  everything the Debtor has submitted and said, there is

1 really no likelihood anymore.  What's likely is a

2 liquidation, an asset sale, not a reorganization.  So they

3 can't satisfy that first prong of the injunctive standard,

4 and they can't show irreparable harm either.

5         Your Honor, other than that, I think I'll rely on

6 my papers.

7         THE COURT: Mr. Oetzell?

8         MR. OETZELL: Your Honor, we're here today to ask

9 that if Your Honor removes the specific injunctions under

10 consideration with respect to the FTC, that it remove all

11 the injunctions, including the injunction against the

12 Receiver.  I think the fact that the Receiver's injunction

13 did not have an end date -- I don't know whether it was the

14 result more of inadvertence than it was craft -- the

15 reasons are the same as those for the FTC, just to keep

16 litigation down.  The reasoning and rationale behind it was

17 found in the same November 2nd memo.  I think they're all

18 the same type of injunctions, and they would all have the

19 same salutary effect if they were removed.

20         THE COURT: Thank you.  Ms. Diemer?

21         MS. DIEMER: Good afternoon, Your Honor.  My

22 concern with what's going on here today is, what we have is

23 a Debtor who has effectively used a Chapter 11 proceeding

24 to do one thing and one thing alone.  And that is to move

25 litigation that they were having trouble with in Florida to

1    a new location.  What we get from the Debtor in this case

2    is assurances --

3         THE COURT: Wait a minute.  Weren't you the one

4    who argued very strenuously that I shouldn't let the

5    Florida litigation go forward, that we should do it here.

6         MS. DIEMER: That was when I thought they were

7    reorganizing, Your Honor.  I agree I did, and I believed

8    that to be true at the time.  But what we see now is a

9    Debtor who is not making much in the way of an attempt --

10   certainly not a serious attempt -- to reorganize, and is

11   not dealing with or communicating with its creditors.  The

12   reality is, Your Honor, that what happened in this case

13   was, at the beginning it looked like a situation where

14   there was a very clear attempt to reorganize.  That's what

15   we heard from the Debtor.

16        We heard that there was going to be lots of

17   interest and effort to reorganize, and here we are, about

18   six months later, and what we have is a case in which

19   enormous amounts of attorney's fees have been spent.

20   There's been significant diminution of the assets of the

21   estate, and the only thing that has happened is that

22   there's been a stay put in place against the Receiver and

23   the FTC.

24        And frankly, Your Honor, from my secured client,

25   POL's interest, I don't perceive that allowing further

1   large amounts of money to be used to deal with this case,

2   gets us any further. And so, Your Honor, on all of my

3   clients' behalf, I am really concerned about what's

4   happening in this case. We're not getting any further

5   along. We have --

6           THE COURT: Does this have anything to do with

7   whether or not I should lift the injunction?

8           MS. DIEMER: Yes. If you lift the injunction, the

9   case will go -- whatever happens, happens, and we'll be

10  moving forward. We're in stasis right now, Your Honor, a

11  stasis that costs my clients money.

12          THE COURT: Go ahead, Mr. Mora.

13          MR. MORA: Yes, Your Honor, one more point I

14  wanted to make, and that is, we also argued in our brief,

15  and I don't think there was anything in the Debtor's reply

16  responding to this, that -- of course, we don't think the

17  injunction should be extended at all. But if Your Honor is

18  inclined to do it, we think it's very clear under the four

19  corners of the complaint that the Debtor filed here, under

20  controlling law, that it cannot be extended beyond the

21  earlier of the 90 days that the Debtor requested or the

22  confirmation of any Chapter 11 Plan of Reorganization.

23          THE COURT: That is what the complaint says, and

24  so I wouldn't purport to grant more relief than that. The

25  request is for 90 days. The complaint says until a Plan of

1  Reorganization is confirmed, and so Mr. Mora is absolutely

2  right.  I assume that you agree with that.  I mean that

3  doesn't mean the 90 days can't be extended if you don't

4  have a Plan confirmed, but it's the earlier of those two

5  dates.

6        MR. SACKS: Right, Your Honor.  I think it should

7  probably be the effective date of the Plan of

8  Reorganization as opposed to the day on which the Court

9  announces a confirmation.

10        THE COURT: What does your complaint ask for?

11        MR. SACKS: I don't have the complaint in front of

12  me, but obviously the complaint is subject to being

13  amended, but either way, I don't think it's going to be a

14  huge difference if we have a Plan of Reorganization.

15        THE COURT: What does the Plan say about the

16  effective date?

17        MR. SACKS: I don't have that in front of me

18  either, to give you an answer off the top of my head,

19  sorry, Your Honor.

20        THE COURT: Okay.

21        MR. SACKS: I would perceive us going effective

22  quickly after confirmation.  I'm just saying that in that

23  ten days or twenty days whatever might be needed to go

24  effective, I wouldn't see wanting to terminate an

25  injunction, but it might not --

1          THE COURT: Is that a problem for you making it

2    the effective date?

3          MR. MORA: I believe their complaint says that --

4    I don't have that in front of me either, but it says date

5    of confirmation of the Plan of Reorganization, but I don't

6    have it in front of me.  I know I looked at it when we did

7    our papers and I have one more point --

8          THE COURT: I think you're right, but they could

9    always amend that, and so it seems to me that it would be

10   conditioned on their amending.  They can't get more than

11   they're asking for.

12         MR. MORA: And, Your Honor, I have one more point

13   that I'd like to make.

14         THE COURT: Sure.

15         MR. MORA: And I think that what prompted me to

16   add this is what Your Honor just said, that it's likely

17   that the Court is going to issue another 90-day injunction

18   today and then we're at the same place three months from

19   now, which is what happened the last time.  We're going to

20   be here on a hearing to extend it yet again, and that's why

21   this doctrine of divestiture on appeal is there so that

22   when an aggrieved party appeals from an adverse order, they

23   can appeal it, and that appeal can be heard without the

24   goal post being moved, without the bar being raised, as the

25   appeal is pending.  And, you know, that's --

1    THE COURT: You don't seriously contend that I

2  lack jurisdiction to extend an injunction just because

3  another injunction is on appeal; do you?

4    MR. MORA: This injunction, yes, Your Honor,

5  because this is a proceeding where the only thing they

6  sought is what Your Honor gave them in the last order, a

7  preliminary injunction.  That's all this proceeding is

8  about.

9    THE COURT: But I have to -- I have to adjudicate

10 the case as we're going along, and so if they wanted

11 another injunction, you think they should go to the Court

12 of Appeals?  Where should they go?  To the District Court

13 to ask for another --

14    MR. MORA: They could have asked --

15    THE COURT: -- or if they want another injunction

16 out of the Northern District of California, where would

17 they go?

18    MR. MORA: The proper procedure, Your Honor, we

19 spelled this out in our brief.  They could have gone to the

20 Court of Appeals and asked for a remand so that they could

21 get their order modified or extended here, because the

22 applicable doctrine otherwise is that an appeal -- the

23 moment the notice of appeal is filed, divests the

24 Bankruptcy Court of jurisdiction to alter that order.

25 Otherwise --

1          THE COURT: I understand your point.  I don't

2    agree with it, but I do understand it.  Go ahead, Mr.

3    Oetzell.

4          MR. OETZELL: Your Honor, if I might, and I'll try

5    not to repeat what we said in the papers.  These

6    injunctions, particularly the one against the Federal

7    Receiver, have either outlived their usefulness or they're

8    not doing anything at the moment.  The Debtor has had its

9    breathing room.  It has filed a Plan of Reorganization.

10   It's just looking for buyers at the moment.  There's

11   nothing that the Receiver is going to do that's endangering

12   this Plan at all.  If anything, getting this matter taken

13   care of that's pending in Florida -- this is as I've

14   described it an 800-pound gorilla in the room, is going to

15   have some finality and make this a little more attractive

16   to purchasers.

17          One of the reasons that Your Honor imposed this

18   was to avoid litigation costs.  But that's not happening.

19   The litigation, the small litigation costs that we're going

20   to have in Florida in respect to the Federal Receiver's

21   actions are now being eaten up in three separate appellate

22   courts, the Eleventh Circuit, the Northern District of

23   California, and -- excuse me, in three appeals, one before

24   the Eleventh Circuit and two in the District Court in

25   Northern California.

1          There's two pending motions going on right at the

2    moment in respect of the appeal in Northern California,

3    with the FTC alone.  The Federal Receiver hasn't even begun

4    its motions yet.  They'll begin very quickly, and they're

5    going to be aggressive.  We're not saving any money in

6    litigation costs with these injunctions.

7          THE COURT: Thank you.  Historically, Mr. Warren

8    has made comments –- Ms. Newmark, do you want to?  Is Ms.

9    Newmark on the phone?

10          MS. NEWMARK: Yes, I'm on, Your Honor.  I'm sorry.

11   I had my line on mute.  And –-

12          THE COURT: I'm not encouraging you to say

13   anything, just historically, Mr. Warren has sat here and

14   he's made comments.

15          MS. NEWMARK: Sure.

16          THE COURT: So I'm being courteous and saying,

17   does PaymentOne wish to say something?

18          MS. NEWMARK; Thank you, Your Honor.  Well, we are

19   in support of –- we haven't appeared on this matter or

20   filed any papers with respect to the extension of the

21   injunction, but we have continued to, as the Court is

22   aware, pursue an active sale with respect to PaymentOne and

23   it's our understanding that that is also underway for the

24   Debtor.  So we are in support of having the injunction

25   extended.

1    THE COURT: Mr. Fiero, the comment was made that

2  if I were to lift the injunction with respect at least to

3  the Receiver, which isn't really properly before me anyway,

4  but if I were to lift the injunction with respect to the

5  Receiver, the company would be more attractive to

6  prospective buyers.  Do you agree?

7    MR. FIERO: Your Honor, that matter isn't before

8  you today, and I do need to just let you know that at some

9  point in the near future, there will be an arrangement

10  between my law firm and the Receiver, which will result in

11  my being walled off from this case.  So that deal is not

12  completed.  We can't manage to get a final order in front

13  of you that you could sign.  It's Mr. Oetzell's turn to

14  mark that document up.

15    THE COURT: Who will be handling that?

16    MR. FIERO: Mr. Litvak.

17    THE COURT: And he's not here.

18    MR. FIERO: No, he's not here today, Your Honor.

19    THE COURT: Okay.  Which is another reason why we

20  shouldn't get into that in any depth.  Does anybody else --

21  do you wish to reply?

22    MR. SACKS: Yes, Your Honor.  With respect to the

23  comments about this being -- turning toward an asset sale

24  and therefore we're not reorganizing, that's not correct.

25  The Chapter 11 Debtor reorganizes regardless of whether it

1  sells its assets or emerges as a reorganized Debtor with

2  business operations.  There will be a Plan in this case

3  regardless of whether we sell some assets or actually

4  emerge as I said as a reorganized Debtor.

5        I think that's the prime reason for continuing

6  the injunction because at this point we don't know, and as

7  we pointed out, if we are not a reorganized Debtor with

8  continuing operations, it's likely that the main thrust of

9  the Florida proceeding in terms of regulatory impact is

10 meaningless, that there won't be anything to regulate.  And

11 so therefore, we think the injunction is appropriate.

12        The case is not sitting in stasis as counsel have

13 argued.  It is merely a situation where we can't sit here

14 and tell the Court we're talking to the following bidders

15 and they've offered the following things.  We have signed

16 term sheets from bidders.  We are actively pursuing them.

17 This is a very busy time in terms of reorganization.  It's

18 busier than when we were just drafting a Plan, which is

19 largely lawyers' work, so it is absolutely a case that I

20 can represent to the Court is continuing and should

21 continue.

22        With respect to the Receiver, I'll just mention

23 that there are very different reasons for the injunction

24 against the Receiver, which include the fact that the

25 Receiver wants to take 1.76 million dollars out of the

1   estate, and that's a whole different situation than the

2   injunction at issue here.

3          THE COURT: And besides which, I will say that I'm

4   not going to rule on any request by the Receiver.  If the

5   Receiver wants to set a motion, the Receiver should set a

6   motion, and we'll deal with it at the time, when everybody

7   has an opportunity to respond and the correct lawyer for

8   the Committee is here, et cetera, et cetera.

9          MR. SACKS: I think -- oh, with respect to Mr.

10  Goldfarb's declaration, the FTC submitted Mr. Schoshinski's

11  (Phonetic) declaration that went into issues about whether

12  we really would incur the costs that Mr. Dawson said we

13  would in the moving papers, and so we thought it

14  appropriate to have Mr. Goldfarb respond and talk in more

15  detail about exactly what he perceives would happen in

16  Florida and whether that will be as costly as we think it

17  will be.  And so that was the purpose, and I think it's

18  entirely appropriate to have that kind of reply that wasn't

19  necessary unless they were going to take us to task about

20  what they think is going to happen in Florida versus what

21  we think should happen.

22          That's all I have, Your Honor.

23          THE COURT: Thank you.  I'm going to issue my

24  decision unless somebody wants to say something.

25          Before the Court is Debtor's request for a 90-day

1  extension of this Court's preliminary injunction enjoining

2  the FTC and the Receiver from taking actions against Debtor

3  in the Florida action pending in the Florida Court.

4         This Court hereby incorporates all defined terms

5  as well as the findings of fact and conclusions of law as

6  set forth in this Court's Memorandum of Decision filed and

7  entered on November 2nd, 2007, subsequently referred to as

8  "The Memorandum of Decision."  In the Memorandum of

9  Decision, this Court granted a preliminary injunction of

10 limited duration enjoining the enforcement action against

11 Debtor through March 14th, 2008 and setting this hearing to

12 determine whether that preliminary injunction should be

13 continued beyond March 14th.  Debtor has requested a 90-day

14 continuance of that preliminary injunction.  Both the

15 Federal Trade Commission and the Receiver oppose Debtor's

16 request.

17        The Receiver also requests that this Court lift

18 the preliminary injunction that enjoins the continued

19 enforcement of the omnibus order entered by the Florida

20 Court pre-petition.

21        The FTC first argues that this Court lacks

22 jurisdiction to grant Debtor's extension motion, citing In

23 re Padilla, 222 F3d, 1184, 9th Circuit, 2000.  The FTC is

24 incorrect.  As the FTC itself notes, the lack of

25 jurisdiction while an order is on appeal is a judge-made

doctrine and is not absolute.  As the Ninth Circuit
succinctly set forth in <u>Natural Resources Defense Council</u>
<u>versus Southwest Marine, Inc.</u>, 242 F3d, 1163 at 1166, 9th
Circuit 2001, which I will refer to as "NRDC", and I quote:

> "Once a notice of appeal is filed, the District
> Court is divested of jurisdiction over the matter
> being appealed.  This rule is judge made.  Its
> purpose is to promote judicial economy and avoid
> the confusion that would ensue from having the
> same issues before two courts simultaneously.
> The principle of exclusive appellate jurisdiction
> is not, however, absolute.  The District Court
> retains jurisdiction during the pendency of an
> appeal to act to preserve the status quo.  This
> exception to the jurisdictional transfer
> principle has been codified in Rule 62(c) of the
> Federal Rules of Civil Procedure which allows the
> District Court to (in an internal quote)
> 'suspend, modify, restore or grant an injunction
> during the pendency of an appeal upon such terms
> as to bond or otherwise as it considers proper
> for the security of the rights of the adverse
> party.' (End of internal quote).
> The rule grants the District Court no broader
> power than it has always inherently possessed to

1              preserve the status quo during the pendency of an
2              appeal. 'It (and I begin another internal quote)
3              does not restore jurisdiction to the District
4              Court to adjudicate anew the merits of the case.'
5              (End of internal quote) Thus, any action taken
6              pursuant to Rule 62(c) (and I begin another
7              internal quote) 'may not materially alter the
8              status of the case on appeal.' "
9    End of internal quote; end quote.
10   NRDC, 242 F3d at 1166, with internal citations omitted.

11            Federal Rule of Civile Procedure 62(c) is made
12   applicable to this adversary proceeding by Federal Rule of
13   Bankruptcy Procedure 7062.  Under Ninth Circuit authority,
14   this Court has the power to grant a second preliminary
15   injunction while the first preliminary injunction is
16   pending on appeal.  <u>Mayweathers versus Newland</u> (Phonetic)
17   252 F3d, 930 at 935 to 36, 9th Circuit 2001.

18            The Receiver asks this Court to lift the stay on
19   the turnover order on one week's notice to the Debtor.  The
20   hearing scheduled for today is only whether the preliminary
21   injunction of the enforcement action should be extended
22   beyond March 14.  As I mentioned, the Court is not going to
23   consider the Receiver's request to lift the stay of the
24   turnover order at this time.  Should the Receiver wish for
25   this Court to suspend or modify that injunction currently

1  on appeal, the Receiver can set such motion on a regular

2  law and motion calendar or seek by written application to

3  have such motion heard on shortened time for good cause.

4        The Court now turns to whether a 90-day extension

5  of the preliminary injunction enjoining the enforcement

6  action against the Debtor is warranted.  The FTC first

7  opposes Debtor's request, asserting that a discretionary

8  stay under Bankruptcy Code Section 105 cannot be used to

9  conflict with exemption to the automatic stay provided by

10 Bankruptcy Code Section 362(b)(4).  This argument directly

11 contradicts Ninth Circuit authority, and this court

12 determined in the Memorandum of Decision at page 21, line

13 18 through page 22, line 11 that this Court appropriately

14 could use Bankruptcy Code Section 105 to enjoin an action

15 that was not stayed under Bankruptcy Code Section

16 362(b)(4).  The Court adopts in full the reasons stated at

17 that portion of the Memorandum of Decision.

18       The Court now turns to the factors to be

19 considered in granting a further preliminary injunction for

20 an additional 90 days.  As set forth by this Court at

21 Memorandum of Decision, page 19, lines 3 through 9, the

22 Debtor must first show a reasonable likelihood of a

23 successful reorganization.  The FTC alleges the Debtor is

24 using bankruptcy as a haven to evade prosecution for

25 violating consumer protection laws and cannot show a

1   successful reorganization.  This Court disagrees.  The

2   Court finds that at this juncture, Debtor has made a strong

3   showing that Debtor has a reasonable likelihood of a

4   successful reorganization and has met its burdens.

5           In the approximately six months that Debtor has

6   been in bankruptcy, Debtor has negotiated the ongoing use

7   of cash collateral, continues to hold funds in its

8   unrestricted cash reserves, and has filed a proposed Plan

9   of Reorganization.  Under Debtor's current proposed Plan,

10  Debtor will auction its equity interests and emerge as a

11  reorganized Debtor.  Debtor also is discussing with another

12  party the sale of its business outright.  The Debtor also

13  has two separate offers for Debtor's equity interests in

14  each of Debtor's two majority-owned subsidiaries,

15  PaymentOne and In Made Calling Solutions, LLC.  Debtor

16  continues to have the support of the Unsecured Creditors'

17  Committee for Debtor's continued operation and

18  reorganization.

19          Is that correct?

20          MR. FIERO: Yes, Your Honor, absolutely.

21          THE COURT: Thank you.  Simply because Debtor may

22  be contemplating a sale of most or substantially all of its

23  assets as opposed to emerging as an independent entity does

24  not mean that Debtor has not shown a strong likelihood of a

25  successful reorganization.  See Memorandum of Decision,

1  page 19, note 12.

2        The Court must next balance the harms which a

3  preliminary injunction might cause the FTC in weighing

4  those harms against Debtor's threatened injury.  The FTC

5  continues to assert the harms that this Court listed in

6  detail in the Memorandum of Decision at page 23, line 8

7  through page 25, line 5, that the FTC only seeks what the

8  FTC terms as equitable relief in the enforcement action,

9  and this Court cannot grant all of the relief requested by

10  the FTC.  Being enjoined from proceeding in its chosen

11  forum, the Florida Court, would harm the FTC in other

12  critical ways and the FTC's need for permanent injunctive

13  relief is particularly acute here, the FTC argues, because

14  the FTC needs permanent injunctive relief from the Florida

15  Court barring Debtor's allegedly unlawful business

16  practices.

17        The FTC also asserts that permitting the

18  extension of the preliminary injunction would cause

19  irreparable harm to the FTC and the public interest by

20  setting the precedent that a defendant can escape

21  prosecution for committing deceptive and unfair practices,

22  trade practices, by simply filing for bankruptcy, contrary

23  to a specific exemption in the Bankruptcy Code itself.

24        The FTC further asserts that any delay in the

25  FTC's pursuit of the enforcement action against Debtor will

1  adversely affect consumers because consumer victims must

2  wait even longer for redress.  The FTC and consumers will

3  have to wait even longer to obtain a permanent injunction

4  that would enjoin Debtor from further unauthorized billing,

5  and any delay impedes the FTC's ability to provide such

6  recess because with each passing day, more victims move or

7  change telephone numbers.  Debtor asserts that Debtor will

8  be irreparably harmed in two ways if the Court does not

9  continue to enjoin the FTC from prosecuting the enforcement

10 action.  First, Debtor anticipates having to spend over

11 $900,000 in attorney's fees and costs litigating the

12 enforcement action through trial.  Second, litigating the

13 enforcement action will be a major distraction from

14 Debtor's efforts to reorganize.

15         Regarding the attorney's fees estimate, the FTC

16 asserts that these harms are not legally cognizable in the

17 context of a Bankruptcy Code Section 105 injunction.  This

18 Court agrees that while litigation costs generally do not

19 constitute irreparable injury, if those costs are high

20 enough, those costs may constitute at least an element of

21 irreparable injury.  In re First Alliance Mortgage, 264

22 B.R. 634 at 656, Central District of California, 2001,

23 which I will refer to as "FAMCO."  This is particularly so

24 in a bankruptcy case where creditors are unlikely to be

25 paid in full.

1          The FTC further asserts that if this Court were

2 to consider Debtor's projected attorney's fees, those

3 claims are not supported by the conclusory allegations in

4 Mr. Dawson's declaration.  The Federal Trade Commission

5 submitted a detailed declaration of FTC Attorney Robert

6 Schoshinski refuting the declaration of Mr. Dawson.  The

7 FTC asserts that Mr. Dawson surmises in his declaration

8 without any factual support that Debtor's costs of

9 litigating the enforcement action have increased because

10 Debtor's co-defendants have either settled or are likely to

11 settle with the FTC.  The FTC contends that Debtor's

12 litigation expenses will be far less than those

13 contemplated last November because unlike last November,

14 Debtor no longer faces a lengthy trial with several co-

15 defendants introducing evidence that did not relate to

16 Debtor.

17          The FTC argues that if Debtor survives a motion

18 for summary judgment, Debtor would participate in a much

19 shorter, less complex trial, in which Debtor is the only

20 defendant and the only evidence and legal arguments would

21 relate directly to Debtor's conduct.  The FTC also argues

22 that to the extent this Court considers the original

23 declaration of Attorney Neil Goldfarb filed with the court

24 on September 24, 2007 in support of the original request

25 for a temporary restraining order and preliminary

1 injunction, that declaration summarily asserts Debtor will

2 face litigation expenses of between $920,000 and 1.2

3 million dollars, but provides no specific breakdown of the

4 aggregate hours projected to be spent by various defense

5 counsel team members.

6          The FTC notes that the declaration also projects

7 a four-week trial, double the estimated seven to nine days

8 projected by the FTC when all defendants were still in the

9 case.  The FTC asserts that now that Debtor is the only

10 remaining defendant, the trial should be much shorter.

11 Debtor filed a new declaration of Mr. Goldfarb with its

12 reply papers.  In this declaration, Mr. Goldfarb asserts

13 that the projected litigation costs through trial will

14 remain accurate because if the preliminary injunction were

15 to lift, the Debtor would need to oppose a motion for

16 summary judgment and prepare for a trial pending the

17 outcome of the summary judgment motion.

18          Mr. Goldfarb anticipates a two-week trial and

19 says that the decrease in hours by the reduced trial is

20 offset by the increase in the billing rates of his firm and

21 the projected litigation costs remain the same.

22          Debtor asserts that the second harm to the

23 Debtor, if this Court lifts the preliminary injunction, is

24 that litigating the enforcement action will be a major,

25 huge distraction from Debtor's efforts to reorganize.  The

1   FTC asserts that contrary to the Debtor's assertions,

2   Debtor's relatively small staff size does not create an

3   irreparable harm for Debtor, citing In re Brennan, 198 B.R.

4   445 at 451, District of New Jersey, 1996, and EEOC versus

5   Consolidated Freightways Corp. of Delaware, 312 B.R., 657,

6   Western District of Missouri, 2004, hereinafter referred to

7   as "EEOC."

8           The Court finds that neither of these cases apply

9   to the situation before this Court.  In Brennan, the

10  Securities and Exchange Commission, SEC, obtained a 75

11  million dollar pre-petition judgment against an individual.

12  There is no indication in the decision under what chapter

13  the Debtor filed, although an examiner was appointed, so

14  there's a high probability that the case was filed under

15  Chapter 11.  Two days post-petition, the State of New

16  Jersey filed a State Court civil action alleging, inter

17  alia, securities fraud, obstruction of investigation and

18  racketeering activity.  The complaint sought injunctive

19  relief, restitution, and civil monetary penalties.  A month

20  after the complaint was filed, the Debtor agreed to certain

21  restrictions on the Debtor's activities in the securities

22  field.  Shortly thereafter, the Debtor filed an adversary

23  proceeding seeking a Bankruptcy Code Section 105 stay

24  against the State of New Jersey.

25          The Bankruptcy Court granted a preliminary

1  injunction and the District Court reversed asserting that

2  the Bankruptcy Court abused its discretion.  The District

3  Court found that there were limited circumstances under

4  which a Bankruptcy Court could stay a police power exercise

5  under Bankruptcy Code Section 105.  The District Court

6  reversed the Bankruptcy Court on the basis that the

7  Bankruptcy Court did not freely identify the irreparable

8  harm that Debtor would suffer without the injunction.  The

9  District Court stated that the Bankruptcy Court's concerns

10  that too many demands might be placed on the Debtor and his

11  professionals during the early stages of Debtor's

12  bankruptcy and that effective management of the bankruptcy

13  might be disruptive did not rise in that case to the level

14  of irreparable harm.  Brennan, 198, B.R. at 453.

15       The case before this Court is very different from

16  Brennan.  First, the fraud action is at the point of

17  requiring Debtor to oppose a substantial dispositive motion

18  for summary judgment and is also on the verge of trial.  In

19  Brennan, the State had just filed a lawsuit.  Second, in

20  Brennan, the Debtor was at the early stages of his

21  bankruptcy case.  There was no Plan of Reorganization filed

22  as there is in this case.  Here, Debtor and its employees

23  are in the process of responding to at least six different

24  offers, currently, six different offers for the purchase of

25  three separate assets of the Debtor, all of which are

1  operating businesses.

2       Debtor's employees are currently very busy

3  responding to due diligence efforts by the six different

4  potential purchasers.  In addition, Debtor is actively

5  working on amending its proposed Plan of Reorganization and

6  Disclosure Statement in an effort to confirm a Plan of

7  Reorganization.  Debtor has sought a limited 60-day

8  extension of the period in which only Debtor can solicit

9  acceptances for a Plan of Reorganization, the exclusivity

10  period.  While Debtor is continuing the hearing to approve

11  its Disclosure Statement for dissemination, it is clear to

12  this Court that in the next 90 days, Debtor fully intends

13  to confirm a Plan of Reorganization.

14       In EEOC, the District Court vacated the

15  injunction of the Bankruptcy Court and required a

16  liquidating debtor that had only 24 employees to continue

17  the defense of a large governmental discrimination law

18  enforcement action.  The FTC argues that, as in EEOC,

19  Debtor has competent counsel and a reorganization

20  consultant helping Debtor's staff to bear the burden of

21  both defending the enforcement action and orchestrating

22  Debtor's reorganization.  The FTC mistakenly states that in

23  the EEOC case, the Debtor was reorganizing.  However, it is

24  clear from that case that the Debtor in EEOC definitely was

25  liquidating.

1    There is a clear distinction between the demands

2  on the time of employees of a liquidating debtor and a

3  reorganizing one as this Court stated in the Memorandum of

4  Decision.  Confirmation of a Chapter 11 Plan requires an

5  enormous amount of work for both the Debtor and its

6  counsel.  In addition to resolving and addressing any

7  objections by any parties to approval of a Disclosure

8  Statement and confirmation of a Plan, this Court has an

9  independent duty to insure that a Disclosure Statement

10  contains adequate information, In re Main Street A.C.,

11  Inc., 234 B.R. 771 at 774, Bankruptcy Northern District of

12  California, 1999, and an affirmative duty to insure that a

13  Plan satisfies all 16 requirements of Bankruptcy Code

14  Section 1129 for confirmation.  In re AmBank La Mesa,

15  Limited Partnership, (Phonetic) 115, F3d, 650 at 653, 9th

16  Circuit 1997.  Just one of the requirements is that this

17  Court must determine that confirmation of Debtor's Plan

18  will not likely be followed by a liquidation or further

19  financial reorganization, 11 U.S.C. Section 1129(a)(11).

20  Memorandum of Decision at page 34, line 25 through page 35,

21  line 9.

22    Enjoining the enforcement action against Debtor,

23  the Debtor must show that the injunction advances the

24  public interest.  There are two competing public interests

25  in this case.  There's the public interest of the FTC in

enforcing consumer protection laws, and that competes with the public interest in successful reorganization. Of course here, we're only talking about timing of about 90 days, and there's no indication that the consumer protection laws won't be enforced, and we're just talking about 90 days.

The Federal Trade Commission is concerned that this Court's continued preliminary injunction against the enforcement action will set precedent that a defendant can escape prosecution for committing deceptive and unfair trade practices by simply filing for bankruptcy. However, there is no evidence before this Court that Debtor is currently committing any such practices and it's highly unlikely that the Debtor is. Under the spotlight of bankruptcy, the secured creditors, the Creditors' Committee, FTC, Receiver, and potential purchasers are all focused on and scrutinizing the Debtor's activities. It is highly unlikely that the Debtor is currently violating any laws and no one is discovering that.

Moreover, the Court is merely extending a preliminary injunction no more than 90 days at this point, and perhaps less, if a Plan is confirmed earlier. It is not this Court's intent to permit a Debtor to escape from prosecution for committing deceptive and unfair trade practices by simply filing for bankruptcy, and there's no

1   evidence before this Court that the Debtor is doing do.

2   Rather, this is a very special situation, where Debtor

3   likely will not exist in its present form in 90 days.  Is

4   the unusual circumstance of Debtor currently responding to

5   six separate potential purchasers of Debtor's assets as

6   well as the imminent confirmation of Debtor's Plan of

7   Reorganization, combined with Debtor's pending settlement

8   proposal to the FTC on terms similar to those with which

9   the FTC has agreed to settle with a co-defendant, Billing

10  Aggregator, that would warrant a limited preliminary

11  injunction at this time?

12          The next 90 days are an absolutely critical time,

13  are absolutely a critical time, for Debtor in its effort to

14  reorganize.  And the immediate continuation of the

15  enforcement action seriously threatens Debtor's ability to

16  reorganize.  Debtor has only 47 employees to service its 58

17  pre-petition customers and manage Debtor's relations with

18  over fourteen hundred local exchange carriers.

19          Moreover, as the Court has mentioned, Debtor is

20  currently in the process of responding to due diligence to

21  six different potential purchasers of Debtor's assets, as

22  well as responding to preliminary inquiries from numerous

23  other potential bidders.  While Debtor has appointed Paul

24  Webber to evaluate and respond to the pending transactions,

25  the expertise of Debtor's president, Mr. Dawson, continues

1  to be critically needed in structuring and consulting on

2  the reorganization, in handling the due diligence process

3  of multiple interested parties and in continuing to guide

4  Debtor's operation.

5      In addition, the Debtor and Receiver have now

6  agreed to mediate the Receiver's claims.  Mr. Dawson will

7  be a key individual in any such settlement negotiations, as

8  well as any settlement negotiations with The Federal Trade

9  Commission.  Debtor also continues to satisfy the enormous

10  demands of this Chapter 11 debtor in possession by

11  obtaining approval of its Disclosure Statement, confirming

12  a Plan of Reorganization, negotiating continued use of cash

13  collateral, filing monthly operating reports, dealing with

14  the Creditors' Committee, dealing with its secured

15  creditors, and addressing post-petition excise tax issues.

16  However, should Debtor be required to renew defending the

17  enforcement action, Mr. Dawson, who is and will continue to

18  be closely involved in Debtor's defense in the enforcement

19  action will be required to divert his time and attention

20  from Debtor's reorganization to assist Debtor's counsel in

21  the enforcement action in preparing an opposition to a

22  motion for summary judgment that the FTC has stated it will

23  file against Debtor as soon as the preliminary injunction

24  is lifted.

25      Now the Federal Trade Commission attempts to

1    minimize the role of Mr. Dawson and Debtor's other
2    employees in assisting counsel with the opposition to the
3    summary judgment motion.  The FTC argues that Debtor will
4    be able to use much of the opposition already filed by the
5    other co-defendant, Billing Aggregators.  However, the FTC
6    fails to acknowledge that there are unique factual issues
7    that relate to the FTC's claims against the Debtor that no
8    other defendant would have already litigated those issues
9    in the enforcement action.  In order to oppose the Federal
10   Trade Commission's motion for summary judgment, Debtor's
11   employees, and Mr. Dawson in particular, would be required
12   to turn their attention away from the pending potential
13   sales of Debtor's assets and any confirmation of Debtor's
14   Plan of Reorganization to assist counsel in opposing the
15   Federal Trade Commission's motion for summary judgment.

16           In issuing the original preliminary injunction,
17   this Court noted that it was the convergence of the trial
18   schedule in the enforcement action with the first few
19   months of a Chapter 11 bankruptcy case that warranted the
20   limited preliminary injunction.  While the trial date has
21   been temporarily suspended, there is no telling when the
22   Florida Court would reinstate the trial date.  If the trial
23   date were reinstated within or shortly after the brief 90-
24   day extension currently requested by Debtor, Mr. Dawson
25   will be required to fly to Florida to prepare for and

1  possibly participate in the trial in the enforcement

2  action.  The diversion of Debtor's management, and Mr.

3  Dawson in particular, in defending the enforcement action

4  during the next 90 days when Debtor is actively pursuing

5  the sale and/or reorganization of three operating

6  businesses and moving forward to confirm a Plan of

7  Reorganization that maximizes the return to creditors, as

8  well as trying to settle the FTC's and the Receiver's

9  claims, seriously threatens Debtor's reorganization.

10       In addition to the impact of the enforcement

11  action on Debtor's president and other personnel, it would

12  be highly injurious to Debtor and Debtor's prospects for

13  reorganization if Debtor had to spend the additional legal

14  fees and costs associated with the enforcement action

15  during this same critical period.  While there is currently

16  no trial date pending as there was at the time this Court

17  granted the original preliminary injunction, should the

18  preliminary injunction be lifted, it is likely that the

19  Florida Court will reset the litigation on a trial

20  calendar.  At a minimum, if this Court were to lift the

21  preliminary injunction in the next 90 days, the Debtor

22  would likely be required to oppose the motion for summary

23  judgment that the FTC asserts it will file as soon as the

24  preliminary injunction is lifted.

25       Debtor does not provide the Court with a

1 breakdown of the estimated fees that would be required for

2 only opposing the motion for summary judgment, other than

3 say that, quote:

4          "Opposing that motion will require a very

5          substantial investment of attorney and paralegal

6          time."

7 Unquote.  The Declaration of Neil Goldfarb re Emergency

8 Motion for TRO filed on September 24, 2007.  Rather than

9 guessing or estimating the amount of attorney's fees and

10 costs that Debtor would incur in only opposing the motion

11 for summary judgment, the Court notes that Debtor was

12 originally given six weeks to prepare its opposition to the

13 FTC's motion for summary judgment, so the attorney's fees

14 and costs are likely to be substantial.

15      While the Debtor cannot afford additional and

16 unnecessary administrative expenses, the Court is not

17 relying on the cost of litigating the motion for summary

18 judgment and anticipated trial preparation as the main

19 irreparable harm to the Debtor in lifting the preliminary

20 injunction at this juncture.

21      The FTC cites three harms from a continued

22 injunction of the enforcement action.  One, the FTC's

23 inability to obtain the non-monetary equitable relief it

24 seeks against Debtor; two, the FTC's inability to pursue

25 the claims in the enforcement action against Debtor in the

1  Florida Court; and three, the public's interest in

2  permitting the FTC to pursue a vital enforcement strategy

3  to curb the unlawful practice of placing unauthorized

4  charges on consumer's phone bills.  In particular, the FTC

5  stresses that the FTC is harmed by any delay in the FTC's

6  pursuit of the enforcement action against the Debtor

7  because consumer victims must wait even longer for redress

8  with each passing day and more victims move or change

9  telephone numbers.

10        I've already addressed the question about whether

11  the FTC has a list that it would like to update of phone

12  numbers or individuals, but I've learned that it does not.

13  On the other hand, the Debtor is on the verge of confirming

14  a Plan of Reorganization.  The Debtor is actively pursuing

15  assets that will form the basis of a Plan of Reorganization

16  and has delayed approval of a Plan and Disclosure Statement

17  for a short period of time to permit the Debtor to finalize

18  the terms and due diligence related to those potential

19  sales.  No one knows yet what Debtor will consist of in 90

20  days.

21        So to pursue the enforcement action against an

22  entity that will not likely exist in its present form in 90

23  days, where those 90 days are absolutely critical to

24  knowing what the components of the entity will be far

25  outweigh any delay of the enforcement action for a mere 90

1 days where there is no evidence before this Court that the

2 Debtor is currently violating any consumer protection laws.

3   Moreover, as the FTC knows, the Debtor has only

4 sought injunctive relief in this adversary proceeding

5 through confirmation of a Plan of Reorganization, maybe the

6 effective date. Thus, the limited 90-day extension of the

7 preliminary injunction at this critical juncture of

8 Debtor's bankruptcy case is warranted to permit Debtor to

9 pursue a successful reorganization in the very near future.

10   Finally, the public interest in permitting the

11 FTC to pursue enforcement of its consumer protection

12 mission is not completely thwarted during this period. The

13 Court notes that at the same time the FTC says it should be

14 allowed to prosecute the enforcement action against Debtor,

15 the Receiver, who was appointed at the request of the FTC,

16 is seeking mediation of the Receiver's claims against the

17 Debtor.

18   In addition, Debtor asserts and the FTC does not

19 dispute, that on January 30, 2008, Debtor met with the FTC

20 and outlined a settlement framework along the lines of FTC

21 settlement of the enforcement action with co-defendant

22 Billing Aggregator. Debtor has since provided a written

23 settlement proposal to the FTC. If the FTC seeks to

24 resolve this litigation at the earliest possible time,

25 nothing of course in this preliminary injunction precludes

1  the parties from negotiating a consensual resolution of the

2  enforcement action.

3         Based on the unique facts of this case, the

4  critical juncture in this bankruptcy, and consideration of

5  the relative hardship of the parties and the public

6  interest concerns, the Court finds that continued

7  prosecution of the enforcement action severely threatens

8  the integrity of the bankruptcy process and Debtor's

9  imminent prospects of reorganization.  Extending the

10 preliminary injunction of the enforcement action against

11 Debtor through the earlier of confirmation (effective date;

12 we don't know) a confirmation of a Plan of Reorganization

13 or June 12th, 2008 is warranted.

14        Unless lifted before by the confirmation of a

15 Plan of Reorganization, (effective date; if that's what the

16 complaint says) on June 5th, 2008 at 2:00 p.m., the Court

17 will hold a further hearing on whether the preliminary

18 injunction of the enforcement action should be continued

19 beyond June 12.  Hearing June 5.  Any supplemental papers

20 in support of continuing preliminary injunction of the

21 enforcement action beyond June 12 shall be filed and served

22 by May 15.  Any opposition shall be filed by May 22.  Any

23 reply papers to the opposition shall be filed by May 29,

24 2008.

25        Either the FTC or the Debtor may request that the

1  preliminary injunction be lifted before June 12th, 2008 for
2  good cause based on facts that are not currently before
3  this Court.   Counsel for Debtor shall submit a form of
4  order consistent with this decision after review by FTC and
5  the Receiver as to form.

6        Okay.  We're not going to turn to the status
7  conference which is a) on my calendar and we've talked a
8  little bit about that.  Is there anything else that you
9  want to say about that, Mr. Sacks?

10       MR. SACKS: No.  I think the Court is up to date,
11  and will certainly be up to date by the time we go through
12  cash collateral and the exclusivity issues as well.

13       THE COURT: Okay.  The Committee supports the
14  continued use of cash collateral?

15       MR. FIERO: Yes, Your Honor, through April 20.  We
16  think that's a good idea, and we think it will actually be
17  cheaper if we stop coming back so frequently.  We'd like to
18  push costs down here, Your Honor.

19       THE COURT: Okay.

20       MR. SACKS: And, Your Honor, I was going to add
21  that in our view we should ask for final use of cash
22  collateral on that April 20th date.

23       THE COURT: You do what you decide to do.  I don't
24  have that before me.  You're welcome to do that.

25       MR. SACKS: No, I understand.  And I also realize

1 | that I said April --

2 | THE COURT: You have to provide notice because
3 | everybody is going to want to know that -- notice so that
4 | they can file whatever they want to file, not to find out
5 | that final use is requested at the last minute.

6 | MR. SACKS: And that's why I'm saying it now, and
7 | I also note --

8 | THE COURT: Your present intention is to seek
9 | final use for cash collateral?

10 | MR. SACKS: That's correct.

11 | THE COURT: Okay. Well, I mean a lot of that is
12 | going to depend on what you plan to do, either whether
13 | you've settled or what you plan to offer with respect to
14 | the money that's in escrow. So -- and I don't know what
15 | you're going to propose, so it's sort of saying that, what
16 | you've said so far, is only half of the game. Everybody is
17 | going to want to know what your proposition is.

18 | MR. SACKS: Can I also add that we said April 20th
19 | which I think is a Sunday, and so we're going to need to
20 | pick a different date than that.

21 | THE COURT: Okay. I have something set on April
22 | 21st at 1:30 for Billing Resource I'm told. I don't know
23 | what it is.

24 | MR. SACKS: Yes. That would be the date of Ms.
25 | Diemer's continued hearing or --

1          THE COURT: So shall we set -- use that date?

2          MS. DIEMER: That would be, Your Honor.

3          THE COURT: Pardon me?

4          MS. DIEMER: It would be my stuff, Your Honor, on

5     the Enhanced Long Distance dispute.

6          THE COURT: Fine.  So shall we use that date as a

7     Billing Resource date?

8          MR. SACKS: Yes, Your Honor.

9          MS. DIEMER: That would be fine with us.

10          THE COURT: Okay.  Now, assuming as I understand

11     is the present situation that this current request for use

12     of cash collateral includes the same order, vis-a-vis the

13     approximately 1.7 million dollars that the previous orders

14     did, does the Receiver withdraw his opposition to the use

15     of cash collateral?

16          MR. OETZELL: Yes, Your Honor.  We'll have the

17     same agreements as we've had in previous cash collateral

18     orders.

19          THE COURT: Okay.  Did you want to state something

20     at this time?

21          MS. DIEMER: Yes, I would, Your Honor.  We object

22     to the use of cash collateral.  As I understand it, there's

23     been an offer in the papers made by the Billing Resource to

24     segregate approximately $800,000.  The entire amount of the

25     POL claim is not $800,000; it's $1,061,798.  We believe

1  that there should be payments on the agreement.  We believe

2  that there should be payments on the cash collateral now

3  that the New York State Taxing Authority dispute is –- or

4  will be hopefully by the end of today –- approved and

5  therefore completely settled.  But there is also the

6  Tennessee matter.  We're really frustrated by this, Your

7  Honor.

8          The only reason that there is a settlement in the

9  New York case is because we had access and the Debtor's

10 counsel had honored the long-term agreement contained in

11 paragraph 3(f) of the settlement agreement, allowing us

12 access to the counsel, Mr. Noonan (Phonetic).  We have

13 essentially no information other than a brief recitation

14 yesterday from Mr. Sacks about the –- essentially a

15 rewritten recitation of the docket calendar for the

16 Tennessee matter.  We have no access to the Tennessee

17 counsel.  We don't know what's going on in that matter,

18 despite promises for months that we would have the right –-

19 have a telephone conversation with Tennessee counsel, Mr.

20 Dichter (Phonetic) and myself.  And I think that in the

21 current situation, simply saying that it is acceptable to

22 segregate a portion of the funds owed is simply not

23 sufficient.

24         THE COURT: What's the difference between the 800

25 that you're saying and the million that she's saying, Mr.

1  Sacks?

2          MS. DIEMER: Tennessee.

3          MR. SACKS: The answer is, Your Honor, that they

4  claim up to half of money that we may eventually recover,

5  have not recovered, and may eventually recover from

6  Tennessee.  If we recover it, it's already there in

7  Tennessee.  We had to pay it in as a condition for bringing

8  our action.

9          THE COURT: Right.  I remember that.  So it's

10 sitting there either way.

11         MR. SACKS: That's right.  It's there.  They have

12 adequate protection for any money that we recover in

13 Tennessee.  There's no need to segregate any money there.

14         THE COURT: Because it's in Tennessee now.

15         MR. SACKS: That's correct.

16         THE COURT: And you either are going to get it or

17 you're not going to get it.  If you don't get it and they

18 don't get it, then it's in good hands, if you will.

19         MR. SACKS: That's correct.

20         THE COURT: Okay.  Anybody else want to say

21 anything about the cash collateral situation?

22         Before the Court is Debtor's motion for interim

23 use of cash collateral.  The Debtor requests the parties in

24 this Court for further interim use of cash collateral,

25 shall we say through April 21st?

1          MR. SACKS: Yes, Your Honor.

2          THE COURT: Since that's the date of the hearing.

3   Debtor currently seeks authority to use cash collateral on

4   an interim basis pursuant to Debtor's proposed budget for

5   the next two months in exchange for Debtor's stipulated use

6   of that creditor's cash collateral.  The Receiver and POL,

7   Inc. have filed objections to Debtor's motion.  Pursuant to

8   Bankruptcy Code Section 363(c)(2), the Debtor may use cash

9   collateral with the consent of an entity that has an

10  interest in that cash collateral or upon authorization of

11  the Court after notice and a hearing.  If the Court

12  authorizes the use of cash collateral under Bankruptcy Code

13  Section 363(e), this Court must condition such use on the

14  providing of adequate protection to any entity requesting

15  such adequate protection.

16          Under Bankruptcy Code Section 361, adequate

17  protection requires the Debtor grant a replacement lien or

18  other such relief such that the use of cash collateral does

19  not decrease any entity's interest in that cash collateral.

20  Debtor has previously asserted that the Receiver is not a

21  secured creditor and is not entitled to adequate

22  protection.  In granting the use of cash collateral, the

23  Court must also find that Debtor's use of cash collateral

24  is in the best interest of creditors in Debtor's bankruptcy

25  case to permit the interim use of cash collateral under the

1  current cash collateral stipulation with PaymentOne.  The

2  Receiver has withdrawn his objection to the use of cash

3  collateral on the basis articulated on the record.

4      Now there's this dispute about $200, Mr. Oetzell.

5  Can I assume that you've withdrawn your objection, this

6  argument about the $200.33?

7      MR. OETZELL: We're not going to worry about that

8  for the moment, Your Honor.

9      THE COURT: Thank you.  POL objects to any cash

10 collateral order that does not order Debtor to make

11 adequate protections to POL.  POL bases this request on

12 Section 3 of the settlement agreement entered into between

13 Debtor and POL, Inc. which states that when the Debtor

14 ultimately and finally resolves two outstanding tax

15 disputes –- I say two, one with the State of New York and

16 one with the State of Tennessee –- Debtor would owe POL a

17 maximum of $870,671 and $191,127 respectively for each

18 claim, the $191,000 being the Tennessee matter.

19     Debtor has settled its dispute with the New York

20 Taxing Authority and asserts POL is owed $817,215 related

21 to that claim.  While certainly not conceding that Debtor

22 is legally obligated to do such, the Debtor has deposited

23 these funds in a segregated bank account as adequate

24 protection for POL.  The Court finds that depositing the

25 $817,215 into a segregated account adequately protects POL.

1  The 191,000 amount is contingent upon receiving a refund of

2  $382,253 of taxes already paid by Debtor to the State of

3  Tennessee.  The $191,000 amount is already being held by

4  the Tennessee Taxing Authority.  If Debtor receives a

5  refund from the State of Tennessee, Debtor states it will

6  pay POL the amount owed from that contingent claim out of

7  the refund.  Therefore, this Court is not persuaded that

8  Debtor should be required to place a duplicative sum of

9  $191,127 in a bank account as POL requests.

10          For the reasons stated in this decision, POL's

11  objection is overruled.  The Creditors' Committee has

12  consented to the Debtor's further interim use of cash

13  collateral.  Because the Court finds that there is a

14  likelihood of Debtor successfully reorganizing and finds

15  that Debtor's continued use of cash collateral is in the

16  best interest of creditors and the Debtor's bankruptcy

17  estate, the Debtor's request for interim use of cash

18  collateral, pursuant to the current stipulation with

19  PaymentOne is granted.

20          Turning now to Item j), the motion to extend

21  exclusivity, that's unopposed.  Does anybody want to speak

22  to that?

23          MR. FIERO: Your Honor, the Committee has no

24  opposition.  It's pretty obvious what would happen if

25  exclusivity were lifted here.  There would be a huge mess,

1  and we're comfortable with the process that the Debtor is

2  undergoing.

3          THE COURT: Okay.  With regard to the motion to

4  extend the exclusivity period, the Court has reviewed the

5  matter, including the declarations of Debtor's counsel and

6  Debtor's chief restructuring officer and considered the

7  position of the Unsecured Creditors' Committee.  There has

8  been no opposition to the motion.  Cause exists to grant

9  the extension to the exclusive period for filing of a Plan

10  of Reorganization and soliciting acceptances under 1121(d).

11  The motion is granted.

12          Now we turn to Item k), the motion to approve

13  settlement with the State of New York, and there has been

14  no opposition.  Does anybody wants to say anything about

15  that before I rule?

16      (No response.)

17          Debtor proposes to enter into a settlement

18  agreement with the State of New York whereby Debtor will

19  settle a 3.4 million dollar priority claim with the State

20  of New York for $208,389 payable with an initial $20,000

21  payment due the 15th of the first month after the effective

22  date of Debtor's Plan of Reorganization and $10,000 per

23  month due on the 15th of the month thereafter in cash by

24  American Home Assurance Company, the assignment by GMHP

25  Health Insurance Limited of an income tax rebate and the

1  waiver by GMHP Health Insurance of its Proof of Claim in

2  the Debtor's bankruptcy case.

3         The settlement is embodied in the signed closing

4  agreement.  There have been no objections.  The Court

5  approves the compromise described in Debtor's motion.  The

6  Court has considered the matters stated in the declaration

7  filed in support of the motion to compromise, as well as

8  the arguments made by counsel in its brief.  The Court has

9  great latitude -- I'm sorry, I had some extraneous stuff.

10 The Court has considered the matters stated in the

11 declaration filed in support of the motion to compromise,

12 as well as the arguments made by counsel in its brief.  The

13 Court has great latitude in approving compromises of

14 controversies -- In re A & C Properties, 784 F2d, 1377 at

15 1380, 1381, 9ᵗʰ Circuit, 1986.

16        To approve a settlement under Rule 9019, this

17 Court need only find that the settlement was negotiated in

18 good faith and is reasonable, fair and equitable.  A & C

19 Properties, 784 F2d, at 1381.  To determine fairness, the

20 Court must consider one, the probability of success on the

21 merits in the litigation; two, the difficulties if any to

22 be encountered in collection; three, the complexity of the

23 litigation and the expense, inconvenience, and delay

24 attending it; and four, the paramount interests of the

25 creditors and a proper deference to their views.  A & C

1 | <u>Properties</u>, 784 F2d at 1381.

2 |         The proposed settlement with the State of New

3 | York takes into consideration the risk of going forward,

4 | the potential delay in Debtor's bankruptcy case since this

5 | property claim is resolved, and the time and expense of

6 | contesting the claim.  Weighing all these factors leads to

7 | the conclusion that the settlement is fair, reasonable and

8 | equitable under <u>A & C Properties</u>.  The settlement is

9 | approved.  The Debtor shall submit a form of order.

10 |         I had a sentence or two in here about American

11 | Home and GMHP and I'm removing that from my decision.

12 |         Thank you.

13 |         I believe that concludes the matters before the

14 | Court, except that we may have to pick a date or two.  So

15 | we already have the April 21st date.  What else do we need?

16 |         MR. SACKS: I think we should pick a date for

17 | further hearing on the Disclosure Statement and the easiest

18 | thing may be to pick April 21st for that as well.

19 |         THE COURT: That's fine.

20 |         MR. FIEOR: I think that's fine, Your Honor.  We

21 | could always move it up if there was a reason to.

22 |         THE COURT: Absolutely.  And then it would be

23 | notice to everybody present including the telephonics.  So

24 | you might want to take a list of the telephonics with you.

25 |         MR. SACKS: Okay.

1          THE COURT: Anybody else want to say anything

2   before I wish you a pleasant flight back to D.C. and to Los

3   Angeles or San Francisco or wherever you're going?

4          MR. FIERO: Your Honor, I think we also have to

5   have a new status conference date, perhaps the --

6          THE COURT: Shall we just use the 21st?

7          MR. FIERO: Certainly.

8          MR. SACKS: Does the Court expect a new status

9   conference statement?

10          THE COURT: I certainly do.

11          MR. SACKS: Okay.

12          THE COURT: With all the discussion about how

13   active this case is from moment to moment, do you think I

14   would let you off without telling me what's happened during

15   the last month?

16          MR. SACKS: I'll be happy to do that.  One week

17   before, is that --

18          THE COURT: One week is enough.  That's fine.

19   Served on everybody who participated.

20          MR. OETZELL: Your Honor, perhaps we can --

21          THE COURT: Would you pull the microphone --

22          MR. OETZELL: I'm sorry, Your Honor.  Perhaps we

23   could have a holding date for April 21st in respect of the

24   Receiver's motion to lift --

25          THE COURT: If you do it on ordinary time, you can

1  use that date.

2          MR. OETZELL: Okay.

3          MR. SACKS: You've got plenty of time.

4          THE COURT: 1:30 isn't it?

5          MR. SACKS: 1:30.  That's all I have, Your Honor.

6          THE COURT: And that's all the Court has.

7          MR. SACKS: Thank you.

8          THE COURT: Have a safe flight and it's nice to

9  see you all.

10          ALL COUNSEL: Thank you, Your Honor.

11          THE COURT: Take care.  Court is adjourned.

12          THE CLERK: Please rise.

13      (Whereupon, the proceedings are concluded at 2:27

14  p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6          I certify that the foregoing is a correct

7   transcript from the digital sound recording of the

8   proceedings in the above-entitled matter.

9

10  DATED: March 18, 2008

11

12                       By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25